UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LOU LOIBEN'S PERSONALITIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15 CV 1511 |
| vs. | ) | |
| | ) | |
| | ) | |
| AKIB KHANANI (a/k/a "DJ Akib", a/k/a "DJ Akib Entertainment") | ) | |
| | ) | |
| | ) | |
| Defendant. | | |

# PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

## INTRODUCTION

1. Plaintiff Lou Loiben's Personalities, Inc. ("Personalities") seeks immediate emergency injunctive relief to redress Defendant's unauthorized use of Personalities' trade secrets, Defendant's unauthorized use and distribution of Personalities' copyrighted images, and Defendant's false and misleading representations regarding his continued affiliation with Personalities or sponsorship or approval by Personalities.

2. Personalities is a boutique DJ entertainment business that handles corporate and private events. Defendant was an employee of Personalities from February 2011 until February 4, 2015, when Defendant abruptly resigned and started a competing business.

3. While Personalities employed Defendant, he was Personalities' primary DJ for Personalities' fashion-show business. Personalities dominated the Chicago fashion-show industry because of its closely-guarded trade secrets, including its client list and profiles, its preferred music and playlists for such clients, its knowledge of those clients' other specialized requirements, its scripts from past fashion shows, and its financial information about the clients and their past contracts.

4. When Defendant left Personalities' employ, he misappropriated these trade secrets to establish his own business that directly competed against Personalities in the fashion industry. In addition, Defendant used copyrighted photographs from events he worked while employed by Personalities to promote his new business on his new website and on social media sites (including Facebook and Instagram).

5. Using Personalities' trade secrets, Defendant has already contacted Personalities' clients for the upcoming Spring 2015 fashion shows and suggested that they hire Defendant directly instead of using Personalities.

6. Unless this Court grants a temporary restraining order and ultimately a preliminary injunction, Personalities faces devastating financial ruin and the loss of its long-standing clients. Personalities further faces irreversible reputational harm in the fashion industry if Defendant continues to misappropriate such intellectual property and intangible assets.

## BACKGROUND

7. Personalities is a small, individually-owned, boutique company that has been a leader in the high-end DJ entertainment business for both corporate and private events since 1995. (Declaration of Louis J. Loiben ("Loiben Decl."), ¶¶ 1 and 4.) It hosts hundreds of events each year for its clients. (Loiben Dec. ¶ 4.) In 2010, Personalities commenced a focused effort to enter the lucrative fashion-show business in Chicago. (Loiben Dec. ¶ 5.) Fashion shows were important to Personalities not only because of their profitability but also because they typically attract Personalities' target clientele. (Loiben Dec. ¶ 5.)

8. Personalities initially concentrated on a appealing to a limited number of its corporate clients in the fashion industry, such as Macy's. (Loiben Dec. ¶ 6.) Although Personalities was successful in attaining a toehold in the fashion-show market, the market was difficult to enter because of the unique and significant eccentricities and requirements of fashion show producers, clothing designers, modeling agencies, and fashion houses. (Loiben Dec. ¶ 7.) Knowing and being able to cater to all of these specialized needs was key to capturing and maintaining business in the Chicago fashion-show market. (Loiben Dec. ¶ 8.) For that reason,

the Chicago fashion-show industry was dominated for more than thirty years by a single company: Avmar, Inc. d/b/a/ Sound Machine ("Sound Machine"). (Loiben Dec. ¶ 9.)

9. In May of 2012, Personalities acquired Sound Machine, including all of its intellectual property. (Loiben Dec. ¶ 10.) In connection with the acquisition, Personalities obtained, inter alia, the following trade secrets that Sound Machine developed over thirty years of effort and that is crucial to maintaining dominance in the Chicago fashion-show industry: (i) current and past Sound Machine client lists and profiles; (ii) preferred music and playlists for such clients; (iii) other specialized requirements of those clients (e.g., preferred set-ups, equipment, etc.); (iv) scripts for past shows; and (v) financial information about the clients, including past contracts. (Loiben Dec. ¶ 11.) Personalities kept these trade secrets confidential within its organization, providing such information to employees on a need-to-know basis and emphasizing to its employees who obtained any such information the importance of keeping it confidential. (Loiben Dec. ¶ 12.) All of the information was kept on a password-protected computer system. (Loiben Dec. ¶ 12.)

10. From May 2012 through the beginning of February 2015, Personalities maintained Sound Machine's control over the Chicago fashion-show industry. (Loiben Dec. ¶ 13.) Lou Loiben, Personalities' owner, initially maintained the trade-secret information exclusively within his control. (Loiben Dec. ¶ 14.)

11. On March 22, 2011, Defendant became an employee of Personalities. Beginning in mid-2012, Mr. Loiben appointed Defendant as his primary DJ to lead Personalities' fashion-show business. (Loiben Dec. ¶ 15.) In that capacity, Mr. Loiben divulged to Defendant certain Sound Machine clients, their preferred music and playlists, other specialized requirements of those clients, scripts for past shows for those clients, client budgets and bidding techniques, and Sound Machine's advanced music theory for fashion shows. (Loiben Dec. ¶ 16.) Mr. Loiben advised Defendant that such information was confidential and should not be disclosed to anyone because it represented business secrets that the company expended significant time, money and

3

effort to develop. (Loiben Dec. ¶ 17.) Defendant agreed to maintain the secrecy of the information. (Loiben Dec. ¶ 17.)

12. At the time Personalities hired Defendant, Defendant did not have any contacts or experience in the fashion industry. (Loiben Dec. ¶ 19.) Fashion shows occur in Chicago during two distinct timeframes: the Spring fashion-show season begins in mid-February and runs through May; the Fall season begins in August and runs through November. (Loiben Dec. ¶ 20.) At the beginning of February 2015, Personalities fashion-show clients already had advised Personalities of their Spring 2015 show dates but, as was customary in past years, had not yet formally contracted with Personalities for those dates. (Loiben Dec. ¶ 21.)

13. On February 4, 2015, Defendant sent Mr. Loiben a text resigning from his position without notice. Defendant stated that he decided to leave Personalities and "branch off and do [his] own thing. . . . " (Loiben Dec. ¶ 22.) He further stated that "it's been a pleasure working with [Personalities] over the past few years" and that "[he has] learned a lot from" his association with Personalities. (Loiben Dec. ¶ 22.)

14. Immediately thereafter, Defendant began contacting Personalities' clients and informing them that they should book their fashion shows directly through him rather than booking through Personalities. (Loiben Dec. ¶ 23.) Defendant even currently touts Macy's – one of Personalities' clients – as one of his corporate clients on his website, located at http://www.djakib.com/. (Loiben Dec. ¶ 24.)

15. Defendant used Personalities' confidential client list to contact the fashion-show producers and used his knowledge of Personalities' other trade secrets to sell his ability to service these clients. (Loiben Dec. ¶ 25.) To promote his experience in the fashion-show industry, Defendant also has posted on his website (www.djakibentertainment.com) and other social media sites (including Facebook and Instagram) copyrighted photographs and videos from events that he worked as an employee of Personalities, including photos from events produced for Macy's, Fashion Outlets of Chicago, the Debi awards, the Gold Coast fashion show, and the and various Merchandise Mart (MMPI) shows (the "Personalities' Copyrighted Photos").

4

(Loiben Dec. ¶ 26.) Personalities holds the copyright to the Personalities' Copyrighted Photos. (Loiben Dec. ¶ 27.)

16. On February 18, 2015, Personalities filed with the United States Copyright Office an application to register the copyright in the Personalities' Copyrighted Photos, Case No. 1-2152634477. (Loiben Dec. ¶ 28.) Personalities has never given Defendant permission to use the Personalities' Copyrighted Photos. (Loiben Dec. ¶ 29.)

17. Defendant also recently posted the Personalities' Copyrighted Photos on various web sites and social media accounts with the hashtag #personalities and #personalitiesinc, making false and/or misleading representations to the fashion-show producers and others regarding his continued affiliation with Personalities or sponsorship or approval by Personalities. (Loiben Dec. ¶ 30.) Personalities faces devastating financial ruin and the loss of its long-standing clients if Defendant is permitted to continue misappropriating Personalities' copyrights and trade secrets and trade off Personalities' good name. (Loiben Dec. ¶ 31.) Personalities further faces irreversible reputational harm in the fashion industry if Defendant continues to misappropriate such intellectual property and intangible assets. (Loiben Dec. ¶ 32.)

**ARGUMENT**

18. Defendant's plan to take Personalities' trade secrets and copyrighted photos to establish a competing business will irreparably harm Personalities and leave it without an adequate legal remedy. Personalities has invested years of effort and significant investment to establish itself as the leader in the Chicago fashion-show industry, and Defendant's plan to divest Personalities of that investment (and even claim Personalities' association with or endorsement of him) will devastate Plaintiff's business and reputation. This is particularly true when Defendant's actions are occurring just before one of the two busiest times in the fashion show industry. Because these immediate devastating consequences if Defendant were to continue his illegal conduct, emergency injunctive relief is the only way to preserve Personalities' valuable intellectual property and intangible assets.

19. Such injunctive relief is appropriate where, as here, Personalities can show: (1) a threat of irreparable harm; (2) an inadequate remedy at law; (3) a likelihood of success on the merits; (4) that the balance of the hardships favors immediate injunctive relief; and (5) that the public interest favors an injunction. *See, e.g.*, *Promatek Indus., LTD v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002).[1] For the reasons set forth below, Personalities easily satisfies this test and only seeks narrowly-tailored relief to prevent Defendant's illegal actions from destroying Personalities' valuable intellectual property while the parties await a ruling on its motion for preliminary injunction. *Consumer Sales v. Digital Equip. Corp.*, No. 95 C 5049, 1995 U.S. Dist. LEXIS 13374, *5 (N.D. Ill. Sept. 11, 1995).

## I. PERSONALITIES WOULD BE IRREPARABLY HARMED AND HAS NO ADEQUATE REMEDY AT LAW WITHOUT A TEMPORARY RESTRAINING ORDER TO ENJOIN DEFENDANTS FROM ILLEGALLY MISAPPROPRIATING ITS INTELLECTUAL PROPERTY AND MISUSING ITS TRADE SECRETS

20. Defendant abruptly resigned from Personalities and then immediately established a competing company and contacted with Personalities' clients. If Personalities were to allow Defendant to misappropriate its trade secrets, use its copyrighted images to promote his competing business, and imply an endorsement by Personalities, the results would be catastrophic and irreparable to Personalities' business. *See, e.g.*, *Meridian Mut. Ins. Co. v. Meridian Ins. Group*, 128 F.3d 1111, 1120 (7th Cir. 1997) (holding an injury is irreparable when it cannot adequately be compensated in damages); *see also Northwestern Nat'l Ins. Co. v. Alberts*, 937 F.2d 77, 80 (2d Cir. 1991) (holding that "[t]he irreparable injury requisite for the preliminary injunction overlaps with the absent lack of adequate remedy at law necessary to establish the equitable rights.")

21. If Defendant is permitted to continue his illegal acts, Personalities will suffer the following irreparable injury: (1) Personalities will lose its competitive advantage in the fashion

---

[1] The standards for a temporary restraining order and a preliminary injunction are functionally identical. *Illusions Too Reality v. City of Harvey*, No. 02 C 7272, 2003 U.S. Dist. LEXIS 1530, at *11-12 (N.D. Ill. Jan. 31, 2003)

industry; (2) Personalities will lose its long-term clients; Personalities will suffer damage to its reputation and goodwill in the marketplace; (3) Personalities will face financial ruin; and (4) Personalities will lose future revenue, which cannot be precisely calculated. *See, e.g., In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 665 (N.D. Ill. 2002) (granting a preliminary injunction to address anticipated losses stemming from misappropriation of copyrighted works); *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 633 (7th Cir. 2005) (*citing Gold v. Ziff Communications Co.*, 196 Ill. App. 3d 425, 434 (1st Dist.1989)) (holding that Illinois law treats ongoing competition itself as a sufficient basis for irreparable harm). Accordingly, remedies at law are inadequate to compensate Personalities' losses.

## II. THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER BECAUSE PERSONALITIES HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS

22. Personalities' complaint raises numerous serious and substantial claims against Defendant emanating out of Defendant's illegal acts. Among other claims, Personalities seeks relief based upon: (i) the Defendant's misappropriation of Personalities' trade secrets to promote his competing business; (ii) the Defendant's infringement of Personalities' copyrighted photos to promote his business; (iii) Defendant's violation of the Lanham Act and various state statutes for misrepresenting his association with or endorsement by Personalities. To satisfy the "likelihood of success" test, a plaintiff only needs to show a "better than negligible" chance of succeeding on the merits. *Meridian Mut. Ins. Co., Inc.*, 128 F.3d at 1114-15 (7th Cir. 1997) (*see also National People's Action v. Wilmette*, 914 F.2d 1008, 1010-1011 (7th Cir. 1990). Personalities' claims clearly satisfy this standard.

23. Personalities is likely to succeed on his trade secret claim because: (1) Defendant used a trade secret of Personalities without consent and to support his competing business; and (2) Defendant acquired the knowledge of the trade secret through his employment at Personalities and had a duty to maintain its secrecy. 765 ILCS 1065/2(b); *see also UTStarcom, Inc. v. Starent Networks, Corp.*, 675 F. Supp. 2d 854, 873 (7th Cir. 2009). The information

Defendant misappropriated (*i.e.*, client lists, preferences, profiles, etc.) was clearly a trade secret under Illinois law because: (i) the information is not generally available outside of the business; (ii) the information is restricted to a need-to-know basis within the business; (iii) Personalities took steps to protect its disclosure to outsiders; (iv) Personalities spent considerable time, money and effort to develop the information; and (v) it would take a significant effort for others to develop the information. *Id*. at 865.

24. Personalities is likely to succeed in its copyright claim because Personalities has a valid copyright in the photos and Defendant did not have a license to use or otherwise distribute it. *See, e.g., Int'l Code Council v. Nat'l Fire Prot. Ass'n*, No. 02 C 5610, 2006 U.S. Dist. LEXIS 13783, at *48 (N.D. Ill. Mar. 27, 2006) (holding a plaintiff must prove (1) ownership of a valid copyright and (2) copying of an expression the copyright protects).[2] Defendant has therefore infringed Personalities' exclusive rights by: reproducing the copyrights in violation of 17 U.S.C. §§ 106(1); redistributing or otherwise transferring copies of the images in violation of 17 U.S.C. §§ 106(3); and displaying the images in violation of 17 U.S.C. §§ 106(5). And, the Copyright Act authorizes injunctive relief to restrain or prevent infringement of copyright. 17 U.S.C. § 502(a). Courts routinely grant injunctive relief to prevent infringement of intangible intellectual property because, among other reasons, possession of infringing work poses a clear threat of infringement. *MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 520 (9th Cir. 1993) (*overruled on other grounds*) (*see also Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir.1994); *Atari, Inc.*, 672 F.2d at 613, *cert. denied*, 459 U.S. 880 (1982).

25. Personalities is likely to succeed in its Lanham Act and state statutory claims because Defendant touts to clients and the public at large that he remains associated with Personalities and/or that Personalities endorses him. On Defendant's website for his competing enterprise, he posts pictures from fashion events with hashtags "#personalities" and

---

[2] *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 631 (7th Cir. 2003) (holding that an applicant for registration of a copyright has standing to sue on the applied-for copyright) (citing 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 7.16[B][1][a] (2003)).

8

"personalitiesinc". Using these hashtags improperly indicates an association in violation of the Lanham Act.[3] Section 43(a) of the Lanham Act provides, in pertinent part, that:

> (1) Any person who, on or in connection with any goods or services, . . ., uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . .
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). To establish a false association claim under the Lanham Act, Personalities only has the burden of showing that Defendant: (1) made a false or misleading statement, (2) on a subject material to the decision to hire his services, (3) which involves interstate commerce, and (4) that results in actual or probable injury to the Personalities. *See, e.g., B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971-972 (7th Cir. 1999).[4] Personalities can satisfy this burden because of the posts of the hashtagged images on Defendant's website wherein he also touts his nationwide scope (*i.e.*, Chicago, Las Vegas, California, New York, *etc.*). *See, e.g., Maremont v. Susan Fredman Design Group, Ltd.*, 2011 U.S. Dist. LEXIS 140446, 9-10 (N.D. Ill. Dec. 7, 2011). Personalities can show actual or probable injury as Defendant's actions are for the purpose of taking business directly from Personalities. For the same reasons, Defendant's actions violate the Illinois Uniform Deceptive

---

[3] Section 43(a) of the Lanham Act reaches a wide array of unfair competitive practices and is no longer limited to trademark or palming-off claims. *Truck Components, Inc. v. K-H Corp.*, 776 F. Supp. 405, 408-409 (N.D. Ill. 1991)

[4] Actual or likelihood of deception of customers is not necessary to show because Plaintiffs allege that the statements in question are actually false. *See B. Sanfield*, 41 F.3d at 971-72.

Trade Practices Act (815 ILCS 510/1, et seq.) and the Illinois Consumer Fraud And Deceptive Business Practices Act (815 ILCS 505/1, et seq.). *See, e.g.*, *Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc.*, 2001 U.S. Dist. LEXIS 1211, at *4, (N.D. Ill. Feb. 8, 2001) (holding that "claims under the ICFDBPA . . . are to be resolved according to principles set forth under the Lanham Act"); *Am. Nat'l Ins. Co. v. Am. Nat'l Inv. Advisors, LLC*, 2014 U.S. Dist. LEXIS 163294, 58-59 (N.D. Ill. Nov. 21, 2014) (holding that "[i]n cases where the factual allegations forming the basis for Lanham Act claims and UDTPA claims are the same, 'the legal inquiry is the same under both statutes.'")

### III. THE BALANCE OF HARM WEIGHS IN FAVOR OF PERSONALITIES

26. Since Personalities can satisfy its threshold burden of likelihood of success on the merits of its claims, the Court must analyze the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits. *Meridian Mut. Ins. Co., Inc.*, 128 F.3d at 1114-15 (7th Cir. 1997). This evaluation is performed using a "sliding scale" approach: the greater likelihood that Personalities has of prevailing on the merits, the lesser the balance of irrevocable harms must slant in Personalities' favor to warrant and injunction. *See Curtis v. Thompson,* 840 F.2d 1291, 1296 (7th Cir.1988). Here, Personalities will likely succeed on the merits of his claims. Likewise, the balance of harms strongly favors injunctive relief. The harm to Personalities is the potential loss of the lifeblood of its organization – due to the unlawful dissemination of critical trade secrets and intellectual property. The potential harm to Defendant is minimal – simply to cease unlawfully exploiting Personalities' trade secrets and intellectual property. The Defendant's potential harm from ceasing to compete illegally against Personalities pales in comparison to Personalities potential harm in losing its vital proprietary trade secrets and intellectual property. Thus, the balance of the harms militates strongly in favor of injunctive relief.

**IV.    THE PUBLIC INTEREST FAVORS THE ISSUANCE OF AN INJUNCTION**

27. Finally, the public interest favors issuing an injunction because of the clear public interests identified in the Copyright Act and traceable in the other claims Personalities asserts. The public maintains a significant interest in the entry of an injunction here because copyright laws reinforce creative endeavors that benefit the public. *See, e.g., In re Aimster Copyright Litig.,* 252 F. Supp. at 648 (*citing ISC-Bunker Ramo Corp. v. Altech, Inc.,* 765 F. Supp. 1310, 1333 (N.D. Ill 1990)). In addition, public interests are undermined if unethical business conduct – such as the pilfering of confidential business information – goes unchecked. *See IDS Life Ins. Co. v. SunAmerica. Inc.*, 958 F. Supp. 1258, 1281 (N.D. Ill. 1997). To avoid the injustice that Defendant seek to promote, Personalities requests this Court grant this motion.

## **CONCLUSION**

For the reasons stated above, Personalities respectfully asks this Court to enter a temporary restraining order enjoining Defendant, as follows:

a. Temporarily restraining Defendant, his agents, representatives, heirs, assigns, affiliates, and all persons active in concert or participation with him from:

  (1)  Infringing Personalities' copyrighted works;

  (2)  Using or otherwise exploiting Personalities' trade secrets;

  (3)  Encouraging or facilitating others to infringe Personalities' copyrighted works;

  (4)  Encouraging or facilitating others to use or otherwise exploit Personalities' trade secrets;

  (5)  Making any representation or implication of affiliation, connection, or association with or sponsorship or approval by Personalities; and

  (6)  Contacting, soliciting, or contracting with any of Personalities' current or former customers in the fashion industry as reflected on Personalities' confidential client list;

b. Requiring Defendant to provide Personalities with an accounting of any and all revenues received from any of Personalities' current or former customers in the fashion industry as reflected on Personalities' confidential client list;

c. Requiring Defendant to provide Personalities with a list of any of Personalities' current or former customers in the fashion industry (as reflected on Personalities' confidential client list) that Defendant contacted since leaving the employ of Personalities; and

d. Awarding such other and further relief as this Court deems just and proper.

Dated: February 19, 2015                                   Respectfully Submitted,
                                                           Lou Loiben's Personalities, Inc.

                                                           By:  /s/ Stephen J. Rosenfeld
                                                              One of its attorneys

Stephen J. Rosenfeld (ARDC #6183729)
Rebecca A. Edwards (ARDC #6284786)
MANDELL MENKES LLC
1 N. Franklin Street, Ste. 3600
Chicago, IL  60606
Tel:  (312) 251-1000
E-mail:  srosenfeld@mandellmenkes.com
E-mail:  redwards@mandellmenkes.com