UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LOU LOIBEN'S PERSONALITIES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 15 CV 1511 |
| vs. ) | |
| ) | Honorable Jorge L. Alonso |
| ) | |
| AKIB KHANANI (a/k/a "DJ Akib", a/k/a "DJ ) | Magistrate Mary M. Rowland |
| Akib Entertainment") ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiff Lou Loiben's Personalities, Inc. ("Personalities") seeks a preliminary injunction to redress Defendant's unauthorized use of Personalities' trade secrets, Defendant's unauthorized use and distribution of Personalities' copyrighted images, and Defendant's false and misleading representations regarding his continued affiliation with Personalities or sponsorship or approval by Personalities. Personalities is a boutique DJ entertainment business that handles corporate and private events. Since Personalities acquired the market-leader in handling fashion shows in the Chicago area, Personalities has dominated the Chicago fashion-show industry. Personalities has remained the market leader because of its closely-guarded trade secrets, including its client profiles containing thirty-years of intelligence for a number of the large fashion players in the Chicago market.

Defendant was an employee of Personalities from February 2011 until February 4, 2015, when he abruptly resigned and started a competing business. When Defendant left Personalities' employ, he misappropriated Personalities' client profiles to establish his own business that directly competed against Personalities in the fashion industry. In addition, Defendant used copyrighted photographs from events he worked while employed by Personalities to promote his

new business on his new website and on his social media accounts (including Facebook and Instagram) and suggested continuing affiliation with or endorsement by Personalities.

Defendant already has been in contact with a number of Personalities' key, long-term clients for the upcoming Spring 2015 fashion shows and has discussed with them hiring Defendant directly rather than using Personalities. Unless this Court grants a preliminary injunction, Personalities faces devastating financial ruin and losing its long-standing clients. Personalities also faces irreversible reputational harm in the fashion industry if Defendant continues to misappropriate such intellectual property and intangible assets.

## BACKGROUND

### A. The Business Of Personalities

Personalities is a small, individually-owned, boutique company that has been a leader in the high-end DJ entertainment business for both corporate and private events since 1995. (Declaration of Louis J. Loiben ("Loiben Decl."), attached hereto as Exhibit A, ¶¶ 1 and 2.) It hosts hundreds of events each year for its clients. (Loiben Dec. ¶ 3.) In 2010, Personalities commenced a focused effort to enter the lucrative fashion-show business in Chicago. (Loiben Dec. ¶ 4.) Although it initially succeeded in attaining a toehold in the fashion-show market, the market was difficult to penetrate because of the unique and significant eccentricities and requirements of fashion show producers, clothing designers, modeling agencies, and fashion houses. (Loiben Dec. ¶ 4.) Knowing and catering to all of these specialized needs was key to capturing and maintaining business in the Chicago fashion-show market. (Loiben Dec. ¶ 5.) For that reason, the Chicago fashion-show industry was dominated since the 1980's by a single company: Avmar, Inc. d/b/a/ Sound Machine ("Sound Machine"). (Loiben Dec. ¶ 5.)

In May of 2012, Personalities acquired Sound Machine, including all of its tangible and intangible assets. (Loiben Dec. ¶ 6.) This acquisition was important to Personalities not only because of Sound Machine's goodwill in the industry but also because of its extensive confidential client profiles that were crucial to Sound Machine maintaining its long-standing dominance in the industry. (Loiben Dec. ¶ 7.) Personalities kept these trade secrets confidential

within its organization on a password-protected computer system. (Loiben Dec. ¶ 8.) The confidential information was not kept in written form in any other place. (Loiben Dec. ¶ 8.) Outside of Louis Loiben, Personalities's sole owner, the information was disseminated verbally to employees on a strict need-to-know basis. (Loiben Dec. ¶ 9.) Any employee to whom Mr. Loiben provided any information from the confidential client profiles was informed of its confidential nature and instructed about the importance of keeping such information absolutely confidential. (Loiben Dec. ¶ 9.)

These client profiles were a vital competitive advantage for Personalities. (Loiben Dec. ¶ 10.) Although the identities of potential clients in the fashion industry are no secret, the detailed business and personal information in the client profiles is not publically available and has been a key factor in permitting Personalities (and its predecessor Sound Machine) to maintain long-term client relationships in the fashion-show industry. (Loiben Dec. ¶ 11.) Each client profile contains: (i) detailed information about each client's business; (ii) client business cycles and annual recurring calendars of events; (iii) costs and markups/upgrades for each client's prior shows; (iv) key client personnel preferences, including individual likes, dislikes and idiosyncrasies of the key client decision-makers; (v) both personal and professional characteristics of the client contact people; and (vi) each client's preferred business terms for their engagements. (Loiben Dec. ¶ 12.) For example, the client profiles often contain detailed information such as information about a contact's family (to establish a rapport) as well as the contact's general musical preferences (*e.g.*, whimsical pop hits and sexy runway tracks). (Loiben Dec. ¶ 13.) The profiles also contain the contact person's attitude toward business (*e.g.*, appropriate attire for the DJ's at meetings and events and when the person generally expects contact from Personalities about upcoming events). (Loiben Dec. ¶ 14.) Also contained in the profiles are details about a client's preferences on publicity (*e.g.*, whether the client prefers Personalities to post photos on social-media about the event and the general content desired in any such posted photos). (Loiben Dec. ¶ 15.) All of this detailed client information provides Personalities with a significant competitive advantage. (Loiben Dec. ¶ 16.)

3

From the acquisition of Sound Machine in May 2012 through the beginning of February 2015, Personalities maintained Sound Machine's long-term client relationships in the Chicago fashion-show industry. (Loiben Dec. ¶ 17.)

### B. Personalities Hires And Trains The Defendant

On February 4, 2011, Defendant became an employee of Personalities. (Loiben Dec. ¶ 18.) At the time, Defendant was twenty-two years old and looking for additional work as a DJ. (Loiben Dec. ¶ 19.) Personalities initially trained the Defendant to handle school events and later weddings, bar mitzvahs, and corporate events. (Loiben Dec. ¶ 20.)

After Personalities acquired Sound Machine, Mr. Loiben appointed Defendant as Personalities' primary DJ to lead the fashion-show business. (Loiben Dec. ¶ 21.) In that capacity, Mr. Loiben divulged to Defendant client profile information for certain Personalities (and former Sound Machine) clients. (Loiben Dec. ¶ 22.) In particular, Mr. Loiben provided Defendant with detailed information about two key Personalities clients that each ran numerous fashion shows in the Chicago area: Zzazz Productions ("Zazz") and Merchandise Mart Properties, Inc. ("MMPI"). (Loiben Dec. ¶ 23.) Mr. Loiben advised Defendant that such information was confidential and should not be disclosed to anyone because it represented business secrets that the company expended significant time, money and effort to develop. (Loiben Dec. ¶ 23.) Defendant agreed to maintain the secrecy of the information. (Loiben Dec. ¶ 23.)

Before working at Personalities, Defendant had no contact with Zazz or MMPI. (Loiben Dec. ¶ 24.) From mid-2012 until February 4, 2015, Defendant closely worked with Personalities' fashion clients, including Zazz and MMPI, for his position at Personalities. (Loiben Dec. ¶ 25.) Mr. Loiben necessarily disclosed significant portions of the Zazz and MMPI client profiles (among others) to the Defendant for purposes of both handling their existing shows and marketing Personalities for other work. (Loiben Dec. ¶ 26.)

### C. The Defendant Quits And Attempts To Compete With Personalities' Trade Secrets and Other Intellectual Property

Fashion shows occur in Chicago during two distinct timeframes: the Spring fashion-show season begins in mid-February and runs through May; the Fall season begins in August and runs through November. (Loiben Dec. ¶ 27.) At the beginning of February 2015, Personalities fashion-show clients (including Zazz) already had advised Personalities of their Spring 2015 show dates but, as was customary in past years, had not yet formally contracted with Personalities for those dates. (Loiben Dec. ¶ 28.)

On February 4, 2015, Defendant sent Mr. Loiben a text resigning from his position at Personalities without notice. (Loiben Dec. ¶ 29.) Defendant stated that he decided to leave Personalities and "branch off and do [his] own thing. . . ." (Loiben Dec. ¶ 29.) He further stated that "it's been a pleasure working with [Personalities] over the past few years" and that "[he has] learned a lot from" his association with Personalities. (Loiben Dec. ¶ 29.)

Immediately thereafter, Defendant had discussions with Zazz and MMPI about booking their Spring 2015 fashion shows directly through Defendant rather than booking through Personalities. (Loiben Dec. ¶ 30.) Before Defendant left with his knowledge of Personalities' confidential client profiles, both Zazz and MMPI had a consistent, thirty-year history of using Personalities/Sound Machine to handle its key fashion shows. (Loiben Dec. ¶ 31.)

Besides taking with him knowledge of the contents of Personalities' confidential client profiles, Defendant also posted on his website (www.djakibentertainment.com) and other social media sites (including Facebook and Instagram) copyrighted photographs and videos from events that he worked as an employee of Personalities, including photos from events produced for MMPI, Macy's, Fashion Outlets of Chicago, the Debi awards, and the Gold Coast fashion show (the "Personalities' Copyrighted Photos"). (Loiben Dec. ¶ 32.) Personalities holds the

5

copyright to the Personalities' Copyrighted Photos. (Loiben Dec. ¶ 33.)[1] Personalities has never given Defendant permission to use the Personalities' Copyrighted Photos. (Loiben Dec. ¶ 34.)

Defendant also recently posted the Personalities' Copyrighted Photos on various web sites and social media accounts with the hashtag #personalities and #personalitiesinc, making false and/or misleading representations to the fashion-show producers and others regarding his continued affiliation with Personalities or sponsorship or approval by Personalities. (Loiben Dec. ¶ 35.) Personalities never gave Defendant permission to assert such association with or endorsement by Personalities. (Loiben Dec. ¶ 36.)

Personalities faces devastating financial ruin and losing its long-standing clients if Defendant may continue misappropriating Personalities' copyrights and trade secrets and trade off Personalities' good name. (Loiben Dec. ¶ 37.) Personalities also faces irreversible reputational harm in the fashion industry if Defendant continues to misappropriate such intellectual property and intangible assets. (Loiben Dec. ¶ 38.)

## ARGUMENT

Defendant's plan to misappropriate Personalities' trade secrets and copyrighted photos to establish a competing business will irreparably harm Personalities and leave it without an adequate legal remedy. Personalities has invested years of effort and significant capital to establish itself as the leader in the Chicago fashion-show industry, and Defendant's plan to divest Personalities of that investment (and even claim Personalities' association with or endorsement of him) will devastate Plaintiff's business and reputation. This is particularly true when Defendant's actions are occurring just before one of the two busiest times in the fashion show industry. Because of these immediate devastating consequences if Defendant were to continue his illegal conduct, preliminary injunctive relief is the only way to preserve Personalities' valuable intellectual property and intangible assets.

---

[1] On February 18, 2015, Personalities filed with the United States Copyright Office an application to register the copyright in the Personalities' Copyrighted Photos, Case No. 1-2152634477. (Loiben Dec. ¶ 33.)

Such injunctive relief is appropriate where, as here, Personalities can show: (1) a threat of irreparable harm; (2) an inadequate remedy at law; (3) a likelihood of success on the merits; (4) that the balance of the hardships favors immediate injunctive relief; and (5) that the public interest favors an injunction. *See, e.g.*, *Promatek Indus., LTD v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002). For the reasons set forth below, Personalities easily satisfies this test and only seeks narrowly-tailored relief to prevent Defendant's illegal actions from destroying Personalities' valuable intellectual property while the parties litigate this matter. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (holding that the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *see also PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995) (affirming a preliminary injunction in a trade secret misappropriation case).

**I. PERSONALITIES WOULD BE IRREPARABLY HARMED AND HAS NO ADEQUATE REMEDY AT LAW WITHOUT A PRELIMINARY INJUNCTION TO ENJOIN DEFENDANTS FROM ILLEGALLY MISAPPROPRIATING ITS INTELLECTUAL PROPERTY AND MISUSING ITS TRADE SECRETS**

Defendant abruptly resigned from Personalities and then immediately established a competing company and had contact with Personalities' clients concerning upcoming fashion shows. If Personalities were to allow Defendant to misappropriate its trade secrets, use its copyrighted images to promote his competing business, and imply an endorsement by Personalities, the results would be catastrophic and irreparable to Personalities' business. *See, e.g.*, *Meridian Mut. Ins. Co. v. Meridian Ins. Group*, 128 F.3d 1111, 1120 (7th Cir. 1997) (holding an injury is irreparable when it cannot adequately be compensated in damages). Defendant's illegal acts will cause Personalities to suffer the following irreparable harm for which it has no adequate remedy at law: (1) Personalities will lose its competitive advantage in the fashion industry; (2) Personalities will lose its long-term clients; (3) Personalities will suffer damage to its reputation and goodwill in the marketplace; (4) Personalities will face financial ruin; and (5) Personalities will lose future revenue, which cannot be precisely calculated. *See, e.g.*, *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 665 (N.D. Ill. 2002) (granting a

preliminary injunction to address anticipated losses stemming from misappropriation of copyrighted works); *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 633 (7th Cir. 2005) (citing *Gold v. Ziff Commc'ns Co.*, 196 Ill. App. 3d 425, 434 (1st Dist.1989)) (holding that Illinois law treats ongoing competition itself as a sufficient basis for irreparable harm); *see also Promatek Indus., LTD*, 300 F.3d at 813 (holding that "it is well settled that injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss.") Remedies at law are inadequate to compensate Personalities' losses.

II. **THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION BECAUSE PERSONALITIES HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS**

Personalities' complaint raises numerous serious and substantial claims against Defendant emanating out of Defendant's illegal acts. Among other claims, Personalities seeks relief based upon: (i) the Defendant's infringement of Personalities' copyrighted photos to promote his business; (ii) Defendant's violation of the Lanham Act and various state statutes for misrepresenting his association with or endorsement by Personalities; and (iii) the Defendant's misappropriation of Personalities' trade secrets to promote his competing business. To satisfy the "likelihood of success" test, a plaintiff must only show a "better than negligible" chance of succeeding on the merits. *Meridian Mut. Ins. Co.*, 128 F.3d at 1114-15 (see also *National People's Action v. Wilmette*, 914 F.2d 1008, 1010-1011 (7th Cir. 1990)). Personalities' claims clearly satisfy this standard.

A. **Personalities' Copyright Claims Are Likely To Succeed On The Merits**

Personalities is likely to succeed on the merits of its copyright claim because Personalities has a valid copyright in the photos and Defendant did not have a license to use or otherwise distribute them. *See, e.g., Int'l Code Council v. Nat'l Fire Prot. Ass'n*, No. 02 C 5610, 2006 U.S. Dist. LEXIS 13783, at *48 (N.D. Ill. Mar. 27, 2006) (holding a plaintiff must prove

(1) ownership of a valid copyright and (2) copying of an expression the copyright protects).[2] By posting Personalities' copyrighted photos on his website and other social media accounts, Defendant: reproduced the copyrighted images in violation of 17 U.S.C. § 106(1); redistributed or otherwise transferred copies of the images in violation of 17 U.S.C. § 106(3); and displayed the images in violation of 17 U.S.C. § 106(5). The Copyright Act authorizes injunctive relief to restrain or prevent infringement of copyright. *Id.* § 502(a). Courts routinely grant injunctive relief to prevent infringement of intangible intellectual property because, among other reasons, possession of infringing work poses a clear threat of infringement. *MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 520 (9th Cir. 1993) (overruled on other grounds); *see also Zeltiq Aesthetics, Inc. v. Brown Health Relaxation Station L.L.C.*, No. 13-C-575, 2014 U.S. Dist. LEXIS 63064 (E.D. Wis. May 6, 2014).

### B. Personalities' Lanham Act Claim Is Likely To Succeed On The Merits

Personalities is likely to succeed on its Lanham Act and state statutory claims (*i.e.*, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act and violation of the Illinois Uniform Deceptive Trade Practices Act)[3] because Defendant touts to clients and the public at large that he remains associated with Personalities and/or that Personalities endorses him. The Seventh Circuit recognizes these "false association" or "false endorsement" claims under the Lanham Act. *See, e.g.*, *Maremont v. Susan Fredman Design Group, Ltd.*, No. 10 C 7811, 2011 U.S. Dist. LEXIS 140446, at *9-10 (N.D. Ill. Dec. 7, 2011)*; see also Truck Components, Inc. v. K-H Corp.*, 776 F. Supp. 405, 408-09 (N.D. Ill. 1991). On Defendant's

---

[2] *Chi. Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 631 (7th Cir. 2003) (holding that an applicant for registration of a copyright has standing to sue on the applied-for copyright) (citing 2 Melville B. Nimmer & David Nimmer, Nimm*er on Copyright § 7*.16[B][1][a] (2003)).

[3] In matters where the allegations forming claims for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act or violation of the Illinois Uniform Deceptive Trade Practices Act are the same as the Lanham Act claims, the legal inquiry for the Illinois statutory violations is the same as under the Lanham Act. *Am. Nat'l Ins. Co. v. Am. Nat'l Inv. Advisors, L.L.C.*, No. 11-cv-4016, 2014 U.S. Dist. LEXIS 163294, at *58-59 (N.D. Ill. Nov. 21, 2014); *see also Bernina of Am., Inc. v. Fashion Fabrics Int'l*, No. 01 C 585, 2001 U.S. Dist. LEXIS 1211, at *4 (N.D. Ill. Feb. 8, 2001) (holding that "claims under the ICFDBPA . . . are to be resolved according to principles set forth under the Lanham Act").

website for his competing enterprise, he posts pictures from fashion events with hashtags "#personalities" and "#personalitiesinc". Using these hashtags improperly indicates an association with Personalities in violation of the Lanham Act.

To establish a false association claim under the Lanham Act, Personalities only has the burden of showing that Defendant: (1) made a false or misleading statement, (2) on a subject material to the decision to hire his services, (3) which involves interstate commerce, and (4) that results in actual or probable injury to the Personalities. *See, e.g.*, *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971-72 (7th Cir. 1999).[4] Section 43(a) of the Lanham Act provides, in pertinent part, that:

> (1) Any person who, on or in connection with any goods or services, . . ., uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . .
> 
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A) (2006). Personalities can establish a violation of 15 U.S.C. § 1125(a)(1)(A) based on Defendant's posts of the hashtagged images on his website and social media accounts where he also touts his nationwide scope (*i.e.*, Chicago, Las Vegas, California, New York, etc.). Personalities can show actual or probable injury because Defendant's actions are for the purpose of taking business directly from Personalities. Personalities therefore will likely succeed on the merits of its Lanham Act Claim.

---

[4] Actual or likelihood of deception of customers is not necessary to show because Personalities alleges that the statements in question are actually false. *See Mann v. Scott*, 41 F.3d 968, 971-72 (5th Cir. 1994).

### C. Personalities' Claim Under The Illinois Trade Secret Act Is Likely To Succeed On The Merits

Personalities is likely to succeed on its trade secret claim because: (1) Defendant used a trade secret of Personalities without consent and to support his competing business; and (2) Defendant acquired the knowledge of the trade secret through his employment at Personalities and had a duty to maintain its secrecy. 765 Ill. Comp. Stat. 1065/2(b); *see also Stampede Tool Warehouse v. May*, 272 Ill. App. 3d 580, 588 (1995) (Ill. App. Ct. 1st Dist. 1995). The information Defendant misappropriated (*i.e.*, client profiles) was clearly a trade secret under Illinois law because: (i) the information is not generally available outside of the business; (ii) the information is restricted to a need-to-know basis within Personalities; (iii) Personalities took steps to protect its disclosure to outsiders; (iv) Personalities spent considerable time, money and effort to develop the information; and (v) it would take a significant effort for others to develop the information. *Stampede Tool Warehouse*, 272 Ill. App. 3d at 588; *see also The Agency, Inc. v. Grove*, 362 Ill. App. 3d 206, 217-19 (2005).

Numerous Illinois cases have held that client profiles constitute trade secrets. For example, in a case directly analogous to this situation, the Illinois appellate court held that client profiles constitute the type of confidential, particularized information disclosed "during the time the employer-employee relationship exist[s] which [is] unknown to others in the industry and which give[s] the employer advantage over competitors." *The Agency*, 362 Ill. App. 3d at 216-17. The plaintiff in that case was a staffing agency. The appellate court explained that the client profiles did not just contain the "mere identities of the clients" but also contained "client business cycles, expiration dates, and personnel preferences--information that indisputably is not available in [publically-available] directories." *Id.* at 216. The information concerning a client's "business cycles will aid a staffing agency in serving that client's needs. There is a similar value to staffing agencies in knowing the personnel preferences of plaintiff's clients, worker placement history, and expiration dates of contracts between plaintiff and its clients." *Id.* at 217. The

11

appellate court found all of this information to provide a competitive advantage and, therefore, to be confidential. *Id.*

Moreover, the fact that this information could be obtained from the customers themselves did not affect the ability to protect the information as a confidential trade secret because "when individual pieces of information are compiled and organized at a single location as in this case, it is much more valuable and useful than each piece of information individually." *Id.* at 218 (citing *Lyle R. Jager Agency v. Steward*, 253 Ill. App. 3d 631, 640 (1993)). For the same reason, the Illinois appellate court in *Stampede Tool* court held that a customer list was confidential. *Stampede Tool Warehouse*, 272 Ill. App. 3d at 589. The court explained that "[i]n determining whether information is a trade secret, the focus of both the common law and the ITSA is on the secrecy of the information sought to be protected. . . . The key to secrecy is the ease with which the information can be readily duplicated without involving considerable time, effort or expense." *Id.* at 588 (internal citations omitted.)

Here, Personalities' confidential client profiles represent thirty years of information that it spent considerable time, effort and expense compiling. Personalities maintained these profiles confidential on a password-protected computer and only gave Defendant access to such information on a need-to-know basis after apprising him of its confidential nature and the need to maintain its confidentiality. The profiles are therefore trade secrets under 765 Ill. Comp. Stat. 1065/2(b).

Defendant either has used or will inevitably use such information to compete against Personalities. It is irrelevant whether Defendant used the information in the client profiles to contact Personalities clients (such as Zazz and MMPI) directly or simply is using it to secure Spring 2015 fashion show jobs from Personalities clients. *See PepsiCo*, 54 F.3d at 1267. The Illinois Trade Secret Act provides that a court may enjoin "actual or threatened misappropriation" of a trade secret. *Id.* In *Pepsico*, the Seventh Circuit endorsed the inevitable disclosure doctrine, holding that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the

plaintiff's trade secrets." *Id.* at 1269. There – like here – Pepsico asserted that the defendant could not help but rely on the trade secrets as he competes against Pepsico because of his inherent knowledge of those secrets. *Id.* at 1270. The Seventh Circuit concluded that the defendant, unfairly armed with the knowledge of the trade secrets, could not help himself from utilizing it in direct competition with Pepsico and therefore enjoined the defendant from working at a competitor. *Id.* at 1272.

The same is true in this case. The only way that Defendant could secure upcoming fashion show jobs from Personalities' long-standing clients is to use his inherent knowledge of those clients that was derived from the confidential client profiles. For that reason, not only is Personalities likely to succeed in its misappropriation claim against Defendant, but also a preliminary injunction is appropriate to enjoin such actual or inevitable misappropriation.

### III.  THE BALANCE OF HARM WEIGHS IN FAVOR OF PERSONALITIES

Since Personalities can satisfy its threshold burden of likelihood of success on the merits of its claims, the Court must analyze the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits. *Meridian Mut. Ins. Co.*, 128 F.3d at 1114-15. This evaluation is performed using a "sliding scale" approach: the greater likelihood that Personalities has of prevailing on the merits, the lesser the balance of irrevocable harms must slant in Personalities' favor to warrant and injunction. *See Curtis v. Thompson*, 840 F.2d 1291, 1296 (7th Cir. 1988). Here, Personalities has strong claims and will likely succeed on the merits of each of the claims. Likewise, the balance of harms solidly favors injunctive relief. The harm to Personalities is the potential loss of the lifeblood of its organization because of the unlawful dissemination of critical trade secrets and intellectual property. The potential harm to Defendant is minimal – simply ceasing his unlawful exploitation of Personalities' trade secrets and intellectual property. The Defendant can still compete in the marketplace. The requested injunction is narrowly tailored to preclude him from doing so with the advantage of Personalities' trade secrets or other intellectual property. The Defendant's potential harm from ceasing to compete illegally against Personalities pales in comparison to

Personalities potential harm in losing its vital proprietary trade secrets and intellectual property. Thus, the balance of the harms militates strongly in favor of injunctive relief.

**IV. THE PUBLIC INTEREST FAVORS THE ISSUANCE OF AN INJUNCTION**

Finally, the public interest favors issuing an injunction because of the clear public interests identified in the Copyright Act and traceable in the other claims Personalities asserts. The public maintains a significant interest in the entry of an injunction here because copyright laws reinforce creative endeavors that benefit the public. *See, e.g.*, *In re Aimster Copyright Litig.*, 252 F. Supp. 2d at 648 (citing *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1333 (N.D. Ill. 1990)). In addition, public interests are undermined if unethical business conduct – such as the pilfering of confidential business information – goes unchecked. *See IDS Life Ins. Co. v. Sunamerica, Inc.*, 958 F. Supp. 1258, 1281 (N.D. Ill. 1997). To avoid the injustice that Defendant seeks to promote, Personalities requests this Court grant this motion.

**CONCLUSION**

For the reasons stated above, Personalities respectfully asks this Court to enter a preliminary injunction enjoining Defendant, as follows:

    a. Enjoining Defendant, his agents, representatives, heirs, assigns, affiliates, and all persons active in concert or participation with him from:

        (1) Infringing Personalities' copyrighted works;

        (2) Using or otherwise exploiting Personalities' trade secrets;

        (3) Encouraging or facilitating others to infringe Personalities' copyrighted works;

        (4) Encouraging or facilitating others to use or otherwise exploit Personalities' trade secrets;

        (5) Making any representation or implication of affiliation, connection, or association with or sponsorship or approval by Personalities; and

        (6) Soliciting or contracting with any of the following Personalities' customers: Zzazz Productions (*i.e.*, Tracy Tarrantino) Merchandise Mart Properties, Inc. (*i.e.*, Susan Glick and her associates); Harper College (*i.e.*,

Thomas Tucker and his associates); and Live Event Productions (*i.e.*, Ava Anthony).

b.  Requiring Defendant to provide Personalities with an accounting of any and all revenues received from any of Personalities' customers identified in a.(6) above;

c.  Awarding such other and further relief as this Court deems just and proper.

Dated: February 26, 2015

Respectfully Submitted,
Lou Loiben's Personalities, Inc.

By: /s/ Stephen J. Rosenfeld
One of its attorneys

Stephen J. Rosenfeld (ARDC #6183729)
Rebecca A. Edwards (ARDC #6284786)
MANDELL MENKES LLC
1 N. Franklin Street, Ste. 3600
Chicago, IL 60606
Tel: (312) 251-1000
E-mail: srosenfeld@mandellmenkes.com
E-mail: redwards@mandellmenkes.com

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that he served a true and correct copy of the foregoing Plaintiff's Memorandum in Support of Motion for Preliminary Injunction upon Akib Khanani via e-mail (djakib@sbcglobal.net) before 9:30 p.m. (CST) on February 26, 2015.

By: /s/ Stephen J. Rosenfeld