UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LOU LOIBEN'S PERSONALITIES, INC., | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 15 CV 1511 |
| AKIB KHANANI (a/k/a "DJ Akib", a/k/a "DJ Akib Entertainment") | ) |
| Defendant. | ) |

## DECLARATION OF LOUIS J. LOIBEN

I, Louis J. Loiben, declare on oath that I have personal knowledge of the facts set forth below, and, if called as a witness in this matter, would testify to the following:

1. Since 1995, I have been sole owner and shareholder of Lou Loiben's Personalities, Inc. ("Personalities").

2. Personalities is a small, boutique company that has been a leader in the high-end DJ entertainment business for both corporate and private events since 1995.

3. Personalities hosts hundreds of events each year for its clients.

4. In 2010, Personalities commenced a focused effort to enter the lucrative fashion-show business in Chicago. Although it initially succeeded in attaining a toehold in the fashion-show market, the market was difficult to penetrate because of the unique and significant eccentricities and requirements of fashion show producers, clothing designers, modeling agencies, and fashion houses.

5. Knowing and catering to all of these specialized needs was key to capturing and maintaining business in the Chicago fashion-show market. For that reason, the Chicago fashion-show industry was dominated since the 1980's by a single company: Avmar, Inc. d/b/a/ Sound Machine ("Sound Machine").

6. In May of 2012, Personalities acquired Sound Machine, including all of its tangible and intangible assets.

7. This acquisition was important to Personalities not only because of Sound Machine's goodwill in the industry but also because of its extensive confidential client profiles that were crucial to Sound Machine maintaining its long-standing dominance in the industry.

8. Personalities kept these trade secrets confidential within its organization on a password-protected computer system. The confidential information was not kept in written form in any other place.

9. Outside of me, the information was disseminated verbally to employees on a strict need-to-know basis. Any employee to whom I provided any information from the confidential client profiles was informed of its confidential nature and instructed about the importance of keeping such information absolutely confidential.

10. These client profiles were a vital competitive advantage for Personalities.

11. Although the identities of potential clients in the fashion industry are no secret, the detailed business and personal information in the client profiles is not publically available and has been a key factor in permitting Personalities (and its predecessor Sound Machine) to maintain long-term client relationships in the fashion-show industry.

12. Each client profile contains: (i) detailed information about each client's business; (ii) client business cycles and annual recurring calendars of events; (iii) costs and markups/upgrades for each client's prior shows; (iv) key client personnel preferences, including individual likes, dislikes and idiosyncrasies of the key client decision-makers; (v) both personal and professional characteristics of the client contact people; and (vi) each client's preferred business terms for their engagements.

13. For example, the client profiles often contain detailed information such as information about a contact's family (to establish a rapport) as well as the contact's general musical preferences (*e.g.*, whimsical pop hits and sexy runway tracks).

14. The profiles also contain the contact person's attitude toward business (*e.g.*, appropriate attire for the DJ's at meetings and events and when the person generally expects contact from Personalities about upcoming events).

15. Also contained in the profiles are details about a client's preferences on publicity (*e.g.*, whether the client prefers Personalities to post photos on social-media about the event and the general content desired in any such posted photos).

16. All of this detailed client information provides Personalities with a significant competitive advantage.

17. From the acquisition of Sound Machine in May 2012 through the beginning of February 2015, Personalities maintained Sound Machine's long-term client relationships in the Chicago fashion-show industry.

18. On February 4, 2011, Defendant became an employee of Personalities.

19. At the time, Defendant was twenty-two years old and looking for additional work as a DJ.

20. Personalities initially trained the Defendant to handle school events and later weddings, bar mitzvahs, and corporate events.

21. After Personalities acquired Sound Machine, I appointed Defendant as Personalities' primary DJ to lead the fashion-show business.

22. In that capacity, I divulged to Defendant client profile information for certain Personalities (and former Sound Machine) clients.

23. I provided Defendant with detailed information about two key Personalities clients that each ran numerous fashion shows in the Chicago area: Zzazz Productions ("Zazz") and Merchandise Mart Properties, Inc. ("MMPI"). I advised Defendant that such information was confidential and should not be disclosed to anyone

because it represented business secrets that the company expended significant time, money and effort to develop. Defendant agreed to maintain the secrecy of the information.

24. Before working at Personalities, Defendant had no contact with Zazz or MMPI.

25. From mid-2012 until February 4, 2015, Defendant closely worked with Personalities' fashion clients, including Zazz and MMPI, for his position at Personalities.

26. I necessarily disclosed significant portions of the Zazz and MMPI client profiles (among others) to the Defendant for purposes of both handling their existing shows and marketing Personalities for other work.

27. Fashion shows occur in Chicago during two distinct timeframes: the Spring fashion-show season begins in mid-February and runs through May; the Fall season begins in August and runs through November.

28. At the beginning of February 2015, Personalities fashion-show clients (including Zazz) already had advised Personalities of their Spring 2015 show dates but, as was customary in past years, had not yet formally contracted with Personalities for those dates.

29. On February 4, 2015, Defendant sent me a text resigning from his position at Personalities without notice. Defendant stated that he decided to leave Personalities and "branch off and do [his] own thing. . . . " He further stated that "it's been a pleasure working with [Personalities] over the past few years" and that "[he has] learned a lot from" his association with Personalities.

30. Immediately thereafter, Defendant had discussions with Zazz and MMPI about booking their Spring 2015 fashion shows directly through Defendant rather than booking through Personalities.

31. Before Defendant left with his knowledge of Personalities' confidential client profiles, both Zazz and MMPI had a consistent, thirty-year history of using Personalities/Sound Machine to handle its key fashion shows.

32. Besides taking with him knowledge of the contents of Personalities' confidential client profiles, Defendant also posted on his website (www.djakibentertainment.com) and other social media sites (including Facebook and Instagram) copyrighted photographs and videos from events that he worked as an employee of Personalities, including photos from events produced for MMPI, Macy's, Fashion Outlets of Chicago, the Debi awards, and the Gold Coast fashion show (the "Personalities' Copyrighted Photos").

33. Personalities holds the copyright to the Personalities' Copyrighted Photos. On February 18, 2015, Personalities filed with the United States Copyright Office an application to register the copyright in the Personalities' Copyrighted Photos, Case No. 1-2152634477.

34. Personalities has never given Defendant permission to use the Personalities' Copyrighted Photos.

35. Defendant also recently posted the Personalities' Copyrighted Photos on various web sites and social media accounts with the hashtag #personalities and #personalitiesinc, making false and/or misleading representations to the fashion-show producers and others regarding his continued affiliation with Personalities or sponsorship or approval by Personalities.

36. Personalities never gave Defendant permission to assert such association with or endorsement by Personalities.

37. Personalities faces devastating financial ruin and losing its long-standing clients if Defendant may continue misappropriating Personalities' copyrights and trade secrets and trade off Personalities' good name.

38. Personalities also faces irreversible reputational harm in the fashion industry if Defendant continues to misappropriate such intellectual property and intangible assets.

I declare under the penalty of perjury, under the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

Dated: February 26, 2015

_____
**Louis J. Loiben**