```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3  LOU LOIBEN'S PERSONALITIES,    )
    INC.,                          )
 4                                 )
                  Plaintiff,       )
 5                                 )
      v.                           )   No. 15 C 1511
 6                                 )
    AKIB KHANANI (a/k/a "DJ Akib," )
 7  a/k/a "DJ Akib Entertainment", )   Chicago, Illinois
                                   )   February 20, 2015
 8                  Defendant.     )   1:30 p.m.

 9                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE JORGE L. ALONSO
10

11  APPEARANCES:

12  For the Plaintiff:       MANDELL MENKES LLC
                             BY:  MR. STEPHEN J. ROSENFELD
13                                MS. REBECCA ANN EDWARDS
                             One North Franklin Street
14                           Suite 3600
                             Chicago, Illinois  60606
15                           (312) 251-1000

16  For the Defendant:       MR. AKIB KHANANI
                             Pro Se
17                           487 Laurel Oaks Drive
                             Streamwood, Illinois  60107
18

19

20

21

22

23

24

25
```

Nancy C. LaBella, CSR, RMR, CRR
Official Court Reporter
219 South Dearborn Street, Room 1222
Chicago, Illinois  60604
(312) 435-6890
Nancy_LaBella@ilnd.uscourts.gov

1          THE CLERK:  15 C 1511, Lou Loiben's Personalities v.

2     Khanani.

3          MR. ROSENFELD:  Good morning, Your Honor.  Stephen

4     Rosenfeld and Rebecca Edwards on behalf of the plaintiff Lou

5     Loiben's Personalities, Inc.  We also have the plaintiff, Lou

6     Loiben, here as well.

7          THE COURT REPORTER:  Sir, your name, please.

8          MR. KHANANI:  Akib Khanani, the defendant.

9          THE COURT:  So obviously Mr. Khanani was served and

10    Mr. Khanani is present.

11         MR. ROSENFELD:  Yes, Your Honor.  We gave him service

12    of all documents that were filed by the court.

13         THE COURT:  And, Mr. Khanani, have you got an

14    attorney who is going to represent you here today, sir?

15         MR. KHANANI:  Not today, no.

16         THE COURT:  Counsel?

17         MR. ROSENFELD:  Your Honor, we brought, as the Court

18    is aware, a motion for a temporary restraining order.  The

19    situation in this case is that Mr. Loiben owns Personalities,

20    Inc.; and Personalities, Inc., is a DJ entertainment company.

21    It's a small company.  It has about 15 employees.  And

22    Mr. Khanani worked for the company for a period of time.  He

23    has now left the company.  He gave his notice via text

24    message, left the company, set up a competing business.  And

25    Personalities, Your Honor, will suffer irreparable harm if

1    Mr. Khanani isn't enjoined immediately from doing a number of

2    things.

3         First of all, he has taken trade secrets that

4    Personalities spent significant resources to acquire, more

5    than 30 years' worth of acquired intellectual property and

6    intelligence about a number of customers.

7         In addition, Mr. Khanani took and posted copyrighted

8    photographs on his new business website or his personal

9    website and on his social media accounts, both Instagram and

10   Facebook.

11        Finally, he marked a number of those photographs with

12   the hashtag Personalities, which -- which gives the appearance

13   of an association -- a continued association with

14   Personalities or some endorsement by Personalities.

15        So really the motion for temporary restraining order

16   has three bases and three asks.  And I can go through them in

17   detail in a moment.

18        But the first is with regard to the copyright

19   violation.  We want those photographs down.  I understand -- I

20   actually spoke with Mr. Khanani yesterday.  He advised that he

21   had taken certain of those photographs down.  We still see

22   photographs up there.  We would like an immediate order

23   requiring him to take those down.  We would also -- in the

24   same vein, the Lanham Act claim and the copyright claim kind

25   of go together in this case, in that, the Lanham Act

1   violations are apparent on the photographs themselves, on the

2   posts, so if he takes the photographs down, I think that takes

3   care of both the copyright issues --

4           THE COURT:  The hashtags are part of the photographs?

5           MR. ROSENFELD:  Hashtags are part of the posts that

6   include the photographs.  They aren't imbedded in the

7   photographs; but if he takes the post down in addition to the

8   photograph, I think that would handle both the Lanham Act

9   issue and the copyright issue.

10          With regard to the trade secret issue, if I can go

11  into that in a little bit of detail.  My client -- his

12  company, Personalities, has been around since 1995.  And they

13  do -- you know, they're a small company, about 15 employees,

14  and they do events such as bar mitzvahs, weddings, corporate

15  events.

16          In 2012 they decided to diversify and get into the

17  fashion show industry.  And to do so, what they did is they

18  bought a company called Sound Machine.  Sound Machine had been

19  the dominant company in the Chicago fashion show industry for

20  30 years.  And the reason why it was dominant and the reason

21  why no one really could pierce into its dominance in the

22  market is because of the trade secrets it had, the client

23  profiles that it had.  Its clients required that it had a

24  significant amount of knowledge about their businesses, a

25  significant amount of knowledge about what they liked; for

1    example, what types of songs they liked to play, when they

2    wanted the DJ to turn on and off the songs as the models went

3    down the runway.  Basically there are hundreds and hundreds of

4    pieces of information that Sound Machine acquired from each of

5    these customers and created these customer profiles that

6    really -- although there are other players who tried to get

7    into the fashion show industry couldn't because of this

8    business intelligence that Sound Machine acquired over -- over

9    the years, all the customers' specialized requirements, all

10    the customers', you know, past contracts.  It really had a

11    dominance.

12         What Sound Machine did when it acquired -- when

13    Personalities acquired it is it transferred all of that --

14    that intellectual property and also all of its other assets to

15    Personalities.  And Personalities was then dominant in the

16    fashion show industry from 2012 until the present because of

17    these trade secrets that it had, because of the specialized

18    knowledge that it had and that -- frankly, not only the

19    information but also the specialized knowledge it had

20    personally developed in-house to run all of these -- all of

21    these fashion shows.

22         Then Mr. -- Mr. Loiben runs Personalities.  He kept

23    all of this information confidential.  He kept it on his

24    personal laptop, all these profiles on his personal laptop,

25    kept them secured, kept them personally.  He gave them on a

1  need-to-know basis to basically only one employee,

2  Mr. Khanani.  Mr. Khanani was hired by Personalities in 2011.

3  But when Mr. Loiben bought -- and Personalities bought -- the

4  Sound Machine business, he was tasked as kind of the head DJ

5  for the fashion show industry.  So he was provided with a

6  number of these trade secrets necessarily in connection with

7  his employment.  And he was told that --

8          THE COURT:  What sort of secrets?  Playlists?

9          MR. ROSENFELD:  Not just playlists, but exactly

10  what -- what each of these customers liked, how to approach

11  these customers.  One of the things that all of these

12  producers think are important is they don't have to reteach.

13  So that's why they keep going back to the same people.  So

14  it's not just playlists.  It's how they -- how they like the

15  music set up, how they like, you know, the runways to the

16  extent that they --

17          THE COURT:  And all of this is played out in public,

18  literally played out?

19          MR. ROSENFELD:  Well, certain of it -- certain of it

20  did.  Certain -- certainly what songs were played out in

21  public.  But all of the various details about how these

22  customers liked the playlists to be structured, what types of

23  music they like, how they -- how they liked the DJ to set up,

24  all of these various different things, how they -- you know,

25  what types of -- I guess that there are numerous different

1    types of ways of structuring these things based on the type of

2    event.  And these -- and all of these producers require that

3    the DJ companies come to them with these playlists based on

4    this knowledge of how they like the music structured.  They

5    don't want to just have the DJs come with, okay, these are the

6    songs with no thought behind it.  And the thought behind it

7    and the formulas that they go through to put these things

8    together are closely guarded trade secrets.

9           And, again, that's why -- the real proof is in the

10   pudding here.  If it was so easy to just watch, then you would

11   have many, many, many more people -- many more DJs get into

12   this and get these contracts.  The fact of the matter is they

13   didn't.  They tried, but they didn't.  They didn't because

14   Sound Machine originally had that knowledge.  It passed it on

15   to Personalities.

16          And then what happened was after Mr. Khanani left

17   Personalities' employ, for some reason, these contracts didn't

18   just go to some other third party.  My understanding is

19   Mr. Khanani has now been, you know, in contact with certain of

20   these other folks and has gotten a couple of my -- my client's

21   main customers and has gotten shows.  So it's -- it's no --

22   you know, it's -- it's no surprise.

23          Now, from a legal perspective, let's talk about the

24   case law for a minute because I understand from my

25   discussions -- from Mr. Khanani some of the things that he

1   might say.  And I want to address those first.

2          I think that his main defense is going to be, I did

3   not contact these customers; they came to me; so, therefore, I

4   couldn't have divulged the trade secrets.

5          Well, that's not what the law says.  The Illinois law

6   on trade secrets is very clear.  First of all, with regard to

7   trade secrets, these types of specialized knowledge which give

8   a competitive advantage -- customer lists, customer

9   profiles -- have time and time again been considered trade

10  secrets under Illinois law.  And there's no requirement under

11  Illinois law that you have a -- you know, a Nixon kind of

12  break-in and, you know -- and to steal the paper, right?  The

13  knowledge, even if it's memorized through years of use, has

14  time and again under Illinois law been considered the --

15  enough taking of the trade secrets.

16         Now, with regard to who contacted who, we're not

17  claiming necessarily -- I mean, maybe he used these trade

18  secrets to contact the clients.  But the fashion shows

19  themselves, when they are going to take place, that's public

20  knowledge.  I mean, people know when the various fashion shows

21  are.

22         But if you look at the PepsiCo case -- and I can give

23  you a cite.  It's a Seventh Circuit case from 1995.  It's 54

24  Fed. 3d 1262.  And I can pass up a copy if Your Honor would

25  like.

1          THE COURT:  Sure.

2     (Tendered.)

3          MR. ROSENFELD:  What PepsiCo deals with is it deals

4    with the inevitable disclosure doctrine under Illinois law,

5    under Illinois trade secret law.  And the facts of that case,

6    at a very high level, were there was an engineer at PepsiCo

7    who wanted to go work for Quaker Oats.  Quaker Oats had the

8    Gatorade product.  PepsiCo had different sports drinks

9    products.  And the engineer did not go in and take any -- take

10   any information and give it to Quaker Oats.  Those weren't the

11   allegations.  The allegations that Pepsi made were, look, he's

12   going to work on -- on a product that's a competing product.

13   So he will necessarily have to use knowledge he gained at --

14   within our employ.  It doesn't mean that he will tell them the

15   secret to the Pepsi products.  But because he had this

16   knowledge, because he had this specialized knowledge while at

17   Pepsi, going to Quaker Oats, he would necessarily have that.

18          And the Seventh Circuit recognized that and said,

19   yes, you're right; there is the -- what's called inevitable

20   disclosure doctrine that he would inevitably, because he had

21   this knowledge, have to disclose that information to a

22   competitor, use it in a competitive situation; therefore, they

23   sustained an injunction and precluded him from going to Quaker

24   Oats for a period of time, you know, after which that

25   information would necessarily become stale.

1          Well, the same -- the same analysis applies here,

2     Your Honor, because what we have is we have an employee who

3     took information, whether it's in his head or elsewhere, trade

4     secrets that my client spent 30 years developing and spent

5     substantial amounts of money to purchase when it purchased the

6     Sound Machine business.  And whether he contacted clients,

7     whether they contacted him, him working on those clients --

8     the only reason he has those -- he would have those jobs is

9     because of this specialized knowledge.  And it is that

10    specialized knowledge that my client spent so much time and

11    effort to acquire.

12          So for that reason, what we're asking now is a

13    temporary restraining order on the trade secret issue

14    precluding the defendant from working with those clients in

15    the fashion show industry -- he can work with them in other

16    contexts -- but working with them on fashion shows, which

17    would inevitably disclose the trade secret information.

18          Now, with regard to the scope and the duration of

19    this injunction, I agree that you can't preclude this forever.

20    We will admit that.  But I don't know that that is necessarily

21    a germane question right now because all we're asking for at

22    this moment is a temporary restraining order, which only lasts

23    14 days.  And certainly the question is whether it should be

24    one year, five years, three years.  The case law is -- is not

25    exactly clear; but it's in that -- it's in that time frame.

1   We can talk about the duration more when we talk about -- as

2   you might expect, we'll come in on a preliminary injunction or

3   a permanent injunction.  But with regard to a temporary

4   restraining order, I don't know that that is necessarily

5   germane to the issue.

6              THE COURT:  Okay.  Counsel, what's happening in the

7   next 14 days?

8              MR. ROSENFELD:  Your Honor, this is the beginning of

9   the fashion show season.  And it's interesting, what's

10  happened over the years, because of Personalities' and Sound

11  Machines's dominance, is the companies just send them dates

12  and say, look, hold these dates open; and they have.  And the

13  contracts are then done closer to the time frame.

14             In this case, now all of a sudden certain of those

15  clients are switching from saying, "Hold those dates open" to,

16  "We're going to go with the defendant."

17             And this -- the fashion show industry in Chicago is

18  really two specific blocks of time.  There's the spring

19  fashion show season, which starts now and goes for about two

20  months into June, and then there's the fall season, which

21  starts, you know, back to school.

22             THE COURT:  Are there any shows in the next two

23  weeks?

24             MR. ROSENFELD:  Yes, Your Honor, significant amounts

25  of shows and significant amounts of booking that will take

1   place in the next two weeks.

2           So the issue is, if we don't stop it now and

3   immediately, my client will be irreparably harmed because it

4   will -- once it starts losing these shows -- and these same

5   people do 10, 12, 15 shows -- it loses its entire season.  I

6   mean, this is -- it's -- it's quite a coincidence, frankly,

7   that the defendant decided to quit and start, in effect, a

8   competing firm right before the spring fashion show season.  I

9   mean, this is the time, this is the exact time, this is the

10  worst possible time for my client where everything is

11  happening in the fashion show industry.

12          THE COURT:  Okay.  So, again, to get specific, if you

13  submitted a proposed order, I didn't see it.

14          MR. ROSENFELD:  I -- Your Honor, I apologize.  When I

15  initially filed, I didn't have a judge assignment so I did

16  not.  I can submit a proposed order.  In fact, I probably have

17  one with me.  I know I have one on my computer that I can send

18  in.  I can e-mail it in.

19          THE COURT:  In terms of what I was able to figure out

20  what is your actual prayer for relief, it is very broad; but

21  you are getting more specific today.  Some of it is obvious.

22  You want the photographs taken down.  You want him to cease

23  using the name --

24          MR. ROSENFELD:  Right.

25          THE COURT:  -- in a hashtag or any other way.

1          MR. ROSENFELD:  Right.

2          THE COURT:  But on the issue of the trade secrets --

3          MR. ROSENFELD:  I would --

4          THE COURT:  -- specifically, you are requesting?

5          MR. ROSENFELD:  We are requesting that the defendant

6    be precluded from working with the clients that -- basically

7    Personalities' clients that it has the competitive information

8    on.  And really that is a relatively small number of people in

9    the upcoming four months.  It's probably about -- it's

10   probably five names that we can submit to the Court.  So we

11   could be extremely specific and say these --

12         THE COURT:  And you have spoken to Mr. Khanani today.

13   Nothing has changed?  Nothing --

14         MR. ROSENFELD:  I spoke with him yesterday, Your

15   Honor.  I have not spoken with him yet today.  He came into

16   the courtroom as the call was going on.

17         THE COURT:  All right.

18         Mr. Khanani.

19         MR. KHANANI:  He called me yesterday, and we spoke

20   yesterday.

21         First, can I just go through what he said and just --

22         THE COURT:  Sure.

23         MR. KHANANI:  The photos, Mr. Loiben -- I have an

24   Instagram account and a Facebook account and social media.

25   I'm very well-versed with social media.  And I have a lot of

1    followers because I'm a DJ for social media.  He advised me to

2    take the pictures of the fashion shows and post them to my

3    social media account and put the Personalities' hashtag on

4    there so it would promote his company.  It's actually helping

5    his company when I was working for him to get the word out

6    that I'm promoting his company, like, I'm taking a picture of

7    what's going on, hashtagging Personalities so people know that

8    this is a Personalities' event.

9          THE COURT:  So there's no question you did this while

10    you were working for him?

11          MR. KHANANI:  I did this while I was working for him.

12          THE COURT:  And as part of your work for him?

13          MR. KHANANI:  Yes.

14          THE COURT:  You're saying it still helps him; but you

15    understand he's saying thanks, but no thanks.

16          MR. KHANANI:  I've taken every photo that -- I have

17    no problem taking every photo down.  I don't want the photos

18    on my site.  That's -- I don't want them.  So I will take

19    absolutely anything down that you guys send me.  If it's up

20    there, I'll take it down.  I've already told you, I have taken

21    everything that -- in the e-mail that you sent me, every photo

22    I said I've taken down.  And if you can find one, then -- some

23    of the photos though weren't taken by me.  They were taken by

24    people in the audience that hashtagged me and Personalities.

25    So hashtags are just like branding.  So I have no access to

1  those people's accounts, so I can't take that down.  It's

2  people in the audience doing that.  And I didn't tell them to

3  do it.  I don't even know who they are.

4          THE COURT:  You are talking about your Facebook, your

5  Instagram account that --

6          MR. KHANANI:  Yes.

7          THE COURT:  -- you're saying that you can't delete

8  something if somebody else put it up?

9          MR. KHANANI:  Yes.  It's like if somebody in the

10 audience takes a picture and they put a hashtag with DJ Akib

11 and they put a hashtag Personalities, it will show up on both

12 of our pages; but, like, we can't touch it.  It's not our --

13 it's not my picture.  And people in the audience do that.

14 Fashion producers post pictures all the time.  They hashtag my

15 name.  They -- I don't know if they hashtag Personalities or

16 whatever.  But it's just to get the word out and spread the

17 word.  But I have no control over those pictures.

18         MR. ROSENFELD:  Your Honor, if I can interject?

19         We are only asking the defendant to take down those

20 pictures that he put up.

21         MR. KHANANI:  But in the pictures you sent me, those

22 weren't all mine.

23         MR. ROSENFELD:  Okay.  Well, we can only ask him to

24 take down those that he has control over.  And that's our

25 entire ask.

1          THE COURT:  Okay.  Go ahead.

2          MR. KHANANI:  As far as trade secrets go, they're

3     acting like they put me through this rigorous training process

4     and told me the secrets of the trade.  That's not -- that's

5     not how it is, and that's not how it goes.  Like, for example,

6     last year -- Lou doesn't even know how to do a fashion show

7     correctly.  He went to the client because I was unavailable.

8     I was doing a wedding.  And he was going to do a fashion show

9     with another DJ with a client, Susan Glick.  They ended up

10    calling me freaking out asking me to Dropbox and send him

11    songs from my event that I was doing -- I was doing a

12    wedding -- because they didn't know what to do and they didn't

13    know how to choose the songs; and the client was extremely mad

14    and freaking out.

15          Like, he wasn't really teaching me anything.  The

16    process in how the -- as far as, like, how to choose songs,

17    the process in how to choose songs was the fashion show

18    producer gives me a photograph or shows me an outfit and she

19    says, I need a song that's chic; and then I'm just, like,

20    okay; I go through my music library, I go through my

21    knowledge.  We -- me and the fashion show producer search on

22    YouTube.  We get advice from college students, whatever the

23    case is.  The client sometimes sends the songs.  But it's

24    basically me just making a judgment, like, yeah, it's the new

25    song that just came on the radio; that will look perfect for

1   that.  No training from Lou or any trade secrets that I can

2   tell have went into that.

3        I understand that by doing fashion shows, you get

4   better at it.  And I am the first to admit that from when I

5   started to when I'm there right now, I've gotten better at it.

6   But I think any job that you do, whether you're a DJ, an

7   accountant, an attorney, you're going to get better at it over

8   time the more experience that you have.

9        There was no information, no written information that

10  I took from them.  I left Lou's company.  I have a very

11  good -- great relationship with the two fashion show

12  producers, Susan Glick and Tracy Tarrantino.  I -- they call

13  me on a regular basis.  They call me with -- they literally

14  just call me, like, oh, my God, I just heard -- I was at

15  another fashion show and I heard this song; like, check it

16  out, tell me what you think, get back to me.  And that's,

17  like, our whole conversation.  We're on a -- we're basically

18  friends now.  They call me on a weekly basis.  I have helped

19  Tracy with her website just as a favor.  We work very well

20  together.

21        So, no, I did not contact them and I did not say, go

22  with me.  I have told them that I don't even know what's going

23  on right now.  I left Lou's company.  I don't even know what's

24  going on.  I don't even know if I can do any of your shows.  I

25  don't know if I want to do any of your shows.

1       But one thing that he did say was that you've got all

2  the dates for this year, correct, from -- you said it in here;

3  you said, I got all the dates -- I got the fashion show dates;

4  I just didn't get the contracts.

5       Am I allowed to ask him a question?  I'm sorry.

6       THE COURT:  No.  Go ahead, you can argue.

7       MR. KHANANI:  Okay.  So he said that I -- we got the

8  dates for this year, but we didn't get any contracts for them.

9  I'd like to see those dates.  Did they send you any dates?

10  Like, what dates did you get?  Because I got the list of

11  dates.  They wouldn't send them to Lou because they didn't

12  want to work with Lou.  They're very unhappy with his

13  performance.

14       And I didn't quit Lou's company because I wanted to

15  go take fashion show contracts.  They're acting like it's a

16  huge, big ordeal and that there's so many -- it's, like, 25

17  events.  It's literally, like, 20 grand in events.  It's

18  not -- they don't dominate the fashion show market.  There's

19  25 events that go on in one month just at the Merchandise

20  Mart.  There's no dominance in the industry at all whatsoever

21  by Personalities.

22       So, I mean, that's my defense on the trade show

23  secrets.  I mean, there are -- and there are also not a

24  significant amount of shows in the next two weeks.  There are

25  zero shows in the next two weeks.  So I'm not sure -- well,

1   for me.  The shows that -- the shows that I know about from

2   Susan Glick or Tracy Tarrantino, the dates that they said that

3   they have shows, which were the only two people that I worked

4   with Lou on, there are absolutely no dates.

5         MR. ROSENFELD:  Well, if that's true, Your Honor,

6   then a temporary restraining order wouldn't affect him.  So

7   the balance of harms would clearly favor my client.

8         MR. KHANANI:  But as --

9         THE COURT:  Mr. Khanani, you are telling me here that

10  there aren't any shows that you have set up in the fashion

11  industry with any of these clients that haven't been named to

12  me?  I know Macy's was mentioned.  You mentioned Ms. Glick,

13  Ms. Tarrantino.  But you're saying you have no events in the

14  fashion industry in the next two weeks?

15        MR. KHANANI:  I have no contracted events at all with

16  any fashion show producers.

17        THE COURT:  And you don't expect to have one within

18  the next two weeks, meaning the show would take place within

19  the next two weeks?

20        MR. KHANANI:  I'm not sure.  I haven't talked to them

21  about specifics because I didn't know what I could do and what

22  I couldn't do.  I just basically left it as -- they called me

23  and they were, like, hey, we need to talk about upcoming

24  fashion show stuff.  I'm, like, look, I left Lou's company;

25  I'm not really sure what's going on right now; I gotta get

1  back to you because I'm not sure what I'm legally allowed and

2  not allowed to do.  And I just left it at that.

3          THE COURT:  Just to clarify that a little bit,

4  counsel, he's allowed to do anything he wants outside of this

5  realm of the former clients in the fashion show industry,

6  right?

7          MR. ROSENFELD:  Absolutely, Your Honor.

8          THE COURT:  All right.  Mr. Khanani, anything else

9  that you want to say?

10          MR. KHANANI:  Yeah.  They were claiming that I have a

11  Macy's logo on my website saying that I did events for Macy's.

12          MR. ROSENFELD:  Your Honor, that's not part of this

13  case.

14          MR. KHANANI:  Then why was Macy's mentioned, like,

15  ten times?

16          MR. ROSENFELD:  We're not claiming any trademark

17  infringement on behalf of Macy's.

18          MR. KHANANI:  Do you mind if I look really quick?  Is

19  that okay?

20          THE COURT:  Sure.

21    (Brief pause.)

22          MR. KHANANI:  Well, there's other things.  "At the

23  time Personalities hired defendant, defendant did not have any

24  contacts or experience in the fashion industry."  I've done

25  fashion shows with Akira, Nordstom's, Paris Club, different

1   nightclubs.  I was a DJ for six years before I joined Lou's

2   company.  I've done every single event imaginable.  So that's

3   just deliberately not true.  It's just not true.  I've done

4   many fashion shows before I even worked for Lou.

5           "Defendant even currently touts Macy's, one of

6   Personalities' clients, as one of his corporate clients on his

7   website located at DJAkib.com."  Why is that relevant?  I've

8   done events for Macy's for a company out of New York called

9   Scratch Events; and I have their permission to use Macy's on

10  my personal website as one of their clients.

11          THE COURT:  Sir, they're not asking that I do

12  anything about that, nor could they.

13          MR. KHANANI:  Okay.

14          THE COURT:  They're not here on behalf of Macy's.

15          MR. ROSENFELD:  Absolutely, Your Honor.

16          MR. KHANANI:  I was just making a case that's saying,

17  like, half the stuff in here is not relevant and it's just not

18  true.  Yeah.

19          So I don't see why I should have a temporary

20  restraining order against me for not contacting these clients

21  or working with these clients because they, A, don't want to

22  work with Lou and, B, like, I'm friends with them.  Like,

23  they're going to call me.  They're going to ask me for stuff.

24  They have.  Like, they've called -- one of the clients called

25  me yesterday; and she was just talking to me over regular

1    stuff; like, she was talking to me about stresses of her job.

2    Like, it wasn't -- we didn't really touch on anything fashion

3    show related.  I'm friends with these people.  I've worked

4    with them.  That's kind of the way that it is.

5              So I'm sorry I -- yeah.

6              THE COURT:  All right.  Thank you, Mr. Khanani.

7              Counsel, let's go back to trade secrets again.  I

8    need you to specify, more specifically identify, what the

9    secret is.  I know we're talking about client lists is the

10   most concrete item, right?

11             MR. ROSENFELD:  Sure.

12             THE COURT:  Explain to me how it's secret, why it's

13   secret, and explain to me how your client maintained that

14   confidentiality in the context of this situation where there's

15   obviously a public show.

16             MR. ROSENFELD:  Yes, Your Honor.

17             There are a number of things within the client list.

18   It's really a client profile.  In addition to the client list,

19   the information that is kept for the client are the playlists

20   for those clients, going back 30 years; the types of music in

21   general these clients like.  For example, certain clients like

22   more synthesized music, certain clients like music with words

23   on them; the type -- how these clients like to run their

24   fashion shows; you know, where do they want the setup.

25             It is a conglomeration of all of the intelligence

1    that the client -- that my client has received over 30 years.

2    And what that permits these clients to do, Your Honor, is

3    instead of -- instead of hiring somebody and teaching them all

4    of this, saying, no, I just -- I like -- I just like

5    synthesized music, I don't like music with words, I want you

6    to stand here, I want -- you know, when the models go down the

7    runway, here's how I like you to play it, here's the volume,

8    here's -- here are the cues.  All that takes time.  All that

9    is stuff that the clients specifically, you know, would --

10   would have to reteach someone new.

11          In addition, it's all of the contract information;

12   what have they contracted for; what are their contracts going

13   back 30 years; what -- you know, how do these clients, you

14   know, like to be approached.

15          He mentions that he's friends with these clients.

16   He's only friends with these clients because we put them in

17   touch.  He met these clients through us.

18          But, in any event, Your Honor, it's all of the

19   nuances for each of these clients and their events going back

20   30 years, which is why -- which is why these clients come back

21   again and again and again because that is the competitive

22   advantage; that is the competitive information that

23   Personalities and Sound Machine when it originally ran had.

24          So it is the client lists and the client profiles in

25   particular.  And those client profiles are detailed.

1          So what do we do to protect them?  Well, we keep them

2     on a password-protected computer that only Mr. Loiben, who is

3     the president, has access to.  He then -- he then divulges

4     that information to his DJ on a need-to-know basis; you know,

5     here -- okay, you're going to this new client, here's how you

6     should approach her; here's the types of things you should

7     approach her with in terms of music selection; here's how you

8     should handle the fashion show; here's what these people have

9     wanted in the past; they've wanted X, Y, and Z; so, you know,

10    let's do that for them.  It's all of this business

11    intelligence.

12         And the case law is clear that those types of

13    business intelligence information that take time to procure,

14    that take years to procure are the types of trade secrets, the

15    competitive advantage, that have been upheld in the courts.

16    In fact, even -- courts have even upheld prospecting

17    information where people have made, you know, cold calls and

18    gotten prospects, I mean -- which has much, much, much less

19    value or information than what my client has.  And it's not --

20    and, again, we're not saying that the names of every person

21    who is in the fashion industry, that's a trade secret.  I

22    mean, it's the client profiles on these specific clients.

23         If the defendant says there are all these other

24    clients and we don't dominate the market, well, then he's --

25    then there's really no harm because he can go to any of those

1    other clients.  All we're saying is don't go to our clients;

2    don't go to the clients that we spent significant money to

3    purchase the intelligence from, from Sound Machine; and that

4    we have spent significant time and effort in the past several

5    years maintaining.  It's these relationships.  It's these --

6    it's this information that my client has spent all this time.

7            And what defendant is trying to do is trying to take

8    that and use that in a competitive situation, and the law

9    specifically does not allow that.

10           MR. KHANANI:  Can I respond to that, please?

11           THE COURT:  Yes, sir.

12           MR. KHANANI:  He said that there's client profiles

13   that are password protected.  I have never seen a client

14   profile in my life.

15           Basically, it's working next to somebody and knowing

16   their personality.  It's not a secret.  Like, Lou could --

17   he's not telling me anything.  He could not go there, and he's

18   not teaching me this stuff.  By working closely with these

19   producers and with their assistants and with the models is

20   what I've learned.  I'm a -- my talent as a DJ is what they

21   want.  They have, of course, given me advice.  They've done

22   things like that.  But Lou, as he's proven in past situations,

23   he went there and tried to do one himself and he was calling

24   me for my help because I'm the one that has worked with these

25   clients.  He sent me in blind.  When I first started working

1    with these clients, like, they -- it was a struggle.  And

2    since they told me what they've wanted, that's the only reason

3    why I am the way that I am because I -- it's, like, you work

4    closely with somebody for years and years, you know to speak

5    softly to this person; speak loudly to this person; this

6    person can't hear; this person doesn't like when you call him

7    sir.  Like, it's just little things.  It's not trade secrets.

8    There are no trade secrets.  Those aren't trade secrets.  It's

9    just learning somebody's personality and knowing what they

10    like; they like this type of music; they like that type of

11    music.  But that's not the case either because none of

12    these -- it's about the outfits and it's about the designs and

13    it's about what their client wants.  They're hired.  So, like,

14    they get new clients all the time.  The new client says, I

15    want this, this, this, this.  They ask me for my personal

16    opinion and I literally pick songs off the Internet with them.

17    We search YouTube for hours at a time, and we take songs off

18    the Internet.  It has nothing to do with anything that Lou is

19    doing.  These are not trade secrets that he taught me.

20          MR. ROSENFELD:  Well, Your Honor --

21          THE COURT:  Counsel, do you have the capability of

22    drafting a proposed order now?

23          MR. ROSENFELD:  Yes, Your Honor.

24          THE COURT:  You can show it to Mr. Khanani and you

25    can show it to me and we can pass the case.

1          MR. ROSENFELD:  Okay.  That's fine.  Thank you, Your

2     Honor.

3          THE COURT:  We are going to call the case again.

4     They're going to show you a proposed order.  You'll have

5     another chance to argue.  They are going to show you what they

6     want me to enter today so you will know specifically what they

7     want you to be barred or enjoined from doing over the next two

8     weeks, and then I'll hear from both sides again.  But I'd like

9     to see that also before we recall the case.  Okay.

10          MR. ROSENFELD:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MR. KHANANI:  So just wait here?

13          THE COURT:  Or outside so you can talk to them.

14          MR. KHANANI:  Okay.

15          MS. EDWARDS:  Thank you.

16          MR. KHANANI:  Do I have to talk to them?

17          THE COURT:  No, you don't have to.

18       (Recess taken.)

19          THE CLERK:  Recalling, 15 C 1511, Lou Loiben's

20     Personalities v. Khanani.

21          MR. ROSENFELD:  Good afternoon again, Your Honor.

22          THE COURT:  Good afternoon.

23          All right.  And, counsel, you have prepared and

24     tendered and shared with Mr. Khanani your proposed temporary

25     restraining order, correct?

1          MR. ROSENFELD:  All of the above, Your Honor.

2          THE COURT:  Mr. Khanani, have you had a chance to

3    review it?

4          MR. KHANANI:  Yes.

5          THE COURT:  All right, sir.  What's your position?

6          MR. KHANANI:  My position is I will take down every

7    image that he wants me to.

8          Encouraging or facilitating others to infringe

9    Personalities' copyrighted works.  I will not do that.

10         Making representation or implication or -- of

11   affiliation, connection, or association -- I don't have to

12   read these, do I?  I'm sorry.

13         Hashtag, I will never put another hashtag of

14   Personalities again.

15         Soliciting or contracting with Zzazz Productions,

16   Tracy, Merchandise -- I don't feel like I should have to -- I

17   don't feel like I should not be able to talk to these people

18   or work with these people.

19         The reason why I quit Personalities was because Lou

20   still owes me money for fashion shows from over nine months

21   ago.  I have not been paid on these fashion shows.  He was

22   also booking me on my dates and then canceling them last

23   minute, for some reason putting other DJs on them, so it was

24   costing me money.  Like, I could book myself at a nightclub or

25   I could book myself at a wedding or doing something else.  I

```
1   could market myself for those dates.  So that's the reason why
2   I quit.
3           THE COURT:  Mr. Khanani, at this point, I've got
4   sworn -- in essence, you haven't heard anybody sworn in from
5   the plaintiff's side, from Mr. Loiben's or Personalities'
6   side.  But I have a sworn declaration from him.
7           MR. KHANANI:  Okay.
8           THE COURT:  And you are also giving me information,
9   but you're not sworn.  So I'm going to ask, Ms. Fratto, that
10  we swear him in so that I can consider this more like evidence
11  from --
12          MR. KHANANI:  Thank you.
13          THE COURT:  -- the other side.
14    (Defendant sworn.)
15          MR. KHANANI:  So that's the reason why I was
16  frustrated with this company and I was quitting.
17          I also quit in February, which is, like, a very slow
18  time for Personalities.  Like, I wouldn't quit in a high
19  traffic time when he has, like, a ton of events and things
20  like that.  So, like, I felt that by me leaving this company
21  in the middle of -- beginning of February, that, you know, on
22  the books, like, on the calendar, I saw less than ten events
23  for the whole thing.  So I thought that he'd be able to, you
24  know, not be at all, like, hurt or anything because he has
25  three other DJs that work with his company that would be able
```

1    to handle it.  So that's the reason why I left his company.

2          As far as the -- what their -- the trade secrets, the

3    music is made public.  Like, I'm playing the music.  Anybody

4    can come and hear the music corresponding with the songs.  So,

5    like, some DJs go to other fashion shows just so they can get,

6    like -- just so they can hear the songs that are played in the

7    fashion shows.  I watch fashion week from New York.  I pull

8    YouTube clips just so I can listen to the music that they're

9    playing to give me better ideas of what I can do to make

10   myself better.  So everything that I play is public; like,

11   they're hearing everything.  So any other DJ can come in and

12   be, like, oh, I heard it here; I -- here's the producer; this

13   is what she likes; this is what she doesn't like; this is what

14   works with this outfit.

15         I don't see anything private.  They can -- there's an

16   app on your phone called Shazam.  You can literally press a

17   button and it will listen to the song and it will tell you

18   exactly what song is playing for that specific trend or outfit

19   or whatever.  It's public.  It's public knowledge.

20         As far as the profiles that he was talking about,

21   I've never seen a profile written down anywhere for any

22   fashion show producer anywhere.  There's no profiles that I've

23   ever seen in my entire life.

24         Client lists.  Susan and Tracy are the two clients

25   that I would consider working with.  They're both well-known

1   fashion producers in Chicago.  It's -- you can search any --

2   it's all public knowledge.  These aren't private client lists

3   that nobody knows about.  They're on WGN Morning Show.  I know

4   Tracy is.  They're very high-profile fashion show producers.

5   And it's very well known that they produce the certain shows.

6   It's made public as well.

7          I don't think that I should have this temporary

8   restraining order because just because there's no shows within

9   the 14 days, I still need to prepare for shows that are

10  upcoming.  I still think that I should be able to work with

11  these producers because, A, I didn't sign a non-compete with

12  Lou; B, I did not sign an employment contract with Lou; and,

13  C, I'm not going after any contracts that he has with any

14  producers already signed or anything.  And they've expressed

15  interest that they want to work with me.  They said -- when I

16  told them that, hey, I left Lou's -- I left Lou's company, I'm

17  not really sure what's going on, I have to find out legally

18  what I'm able to do, they said, we don't want to work with

19  Lou; we just want to work with you.  And I said, okay, I will

20  get back to you, I don't know what I'm able to do or not.  I

21  feel like it's going to tarnish a relationship, not only a

22  business relationship, but also a friendship.

23         Another thing too is they've hired me without Lou's

24  company.  They paid me directly.  So these aren't only Lou's

25  clients.  They're my clients as well.

1       THE COURT:  All right.  Counsel, any other evidence?

2       MR. ROSENFELD:  No, Your Honor.

3       THE COURT:  Argument?

4       MR. ROSENFELD:  Your Honor, I think that the evidence

5  has been clear on the copyright, on the Lanham Act.

6       I think on the trade secret it is also entirely clear

7  that what -- what defendant has been talking about are the

8  exact things that make this information proprietary.  He's

9  been talking about, well, you know, this person -- this person

10  we know that you have to speak softly with; this person we

11  know -- all that stuff, all that intelligence is gathered over

12  these 30 years.  It is these types of intelligence that are

13  within -- I mean, those are just small pieces of these

14  profiles.  But it's that type of intelligence that's gathered,

15  that's in one place that makes -- that gives Sound Machine and

16  Personalities this competitive advantage.

17       And it's -- I'm sure that the defendant hasn't seen

18  the printout of these profiles.  He's given the information he

19  needs to go and do his job, which is from these profiles.

20       So -- in any event, Your Honor, I think that it's

21  clear that we have a protectable interest.  I think the case

22  law is clear that this type of business intelligence gives us

23  a protectable interest.

24       Under the inevitable disclosure doctrine, whether he

25  has disclosed it or not at this point is irrelevant, as it

1    will be inevitably disclosed by his use of this type of

2    information in working on the fashion shows.

3         And all we're asking him to do is stop working on

4    fashion shows for these five clients or one -- excuse me --

5    four clients that we specifically listed.  It's a very narrow

6    group.  And if he claims that there are all these other

7    fashion shows, all these other clients out there, he's more

8    than welcome to work on those and do whatever he wants because

9    we don't have that intelligence on anyone other than the

10   people who we're listing here.

11        THE COURT:  All right, Mr. Khanani, one last time.

12        MR. KHANANI:  I just don't see -- I don't see how

13   they have any evidence or any type of -- any type of way to

14   tell me that I can't work with these clients.  I don't think

15   they've correctly proven that I have broken any type of trade

16   secrets.  They're not secrets.  They're public knowledge.  I

17   mean, it's just the way that it is.  And they're not Lou's

18   clients.  They're both of our clients because I've worked with

19   them directly.  They've paid me directly for fashion shows

20   last year.

21        THE COURT:  Outside of your employment with --

22        MR. KHANANI:  Outside of my employment with Lou.  I

23   do not have an employment contract with Lou.  And I also do

24   not have a non-compete with Lou.  And -- yes.

25        MR. ROSENFELD:  Well, that would be a breach of his

1    duty of loyalty.  But, nonetheless, it's -- it doesn't change

2    the calculous, whether he worked independently during his

3    employ with Lou using the same information.

4         THE COURT:  Counsel, obviously the weakest part of

5    your case here goes to this trade secrets.  So one more time,

6    what is the trade secret, sir?  Aside from these lists and

7    protocol, let's get to the heart of the issue, which is

8    whether the identity of these four individuals is a trade

9    secret.

10        MR. ROSENFELD:  No, Your Honor.  The identity of the

11   four individuals we are not claiming is -- is a trade secret.

12   It is the business intelligence that goes along with that

13   identity.  I mean, it is -- we're not disputing that it's well

14   known that Ms. Tarrantino or Ms. Glick produce fashion shows

15   in Chicago.  The identity of those folks is known in the

16   industry.

17        It is the business intelligence that Personalities

18   has gathered on these folks over that 30-year period of time,

19   which has given them the lock on them in the industry.  I

20   mean, that's the -- that's the proof of the value of this

21   business intelligence.  The fact that over that period of

22   time, these folks have not hired -- despite many other DJs

23   trying to get the business, they have not hired anyone else

24   other than Sound Machine or Personalities or, apparently, the

25   defendant while working for Personalities.  But the reason why

1    is that they expect -- they expect their DJs to have this

2    information that they have gathered over this period of time

3    that gives us an advantage, a competitive advantage over

4    people because they don't have to relearn it.  They don't have

5    to be told it.  We know all of the business intelligence.  We

6    have spent a lot of time, a lot of money acquiring that.  And

7    that -- those profiles are the trade secret, Your Honor.

8           MR. KHANANI:  Can I just counter with one more thing,

9    please?

10          They're not hiring me because of any -- they're

11   hiring me because of my skill as a DJ and my style and my

12   talent as a DJ.

13          Their previous DJ that they were working with, that

14   Lou bought his company, was DJ'ing with two iPods and a mixer.

15   I bring in state-of-the-art equipment.  I can mix; I can

16   scratch; I can do things that these older DJs and the person

17   they were working with before could not do.  And they love

18   that about me.  They -- this is my personality.  This is

19   something that I do with or without Lou's company.  It's just

20   something that I've made a name for myself when I do

21   nightclubs and when I do different weddings and when I do

22   other fashion shows that have nothing to do with Lou.  That's

23   why they're hiring me.  That's why they want to work with me.

24   It's not because of these trade secrets that I don't think

25   that you're -- there are no trade secrets that you have

1   proven.  There's nothing.  Like, you can't give a straight

2   answer on a trade secret.

3          Sorry if I was out of line.

4          I have not seen a trade secret that you can actually

5   argue that's a real secret.  Everything is public knowledge.

6   They want me for my talent as a DJ.  And they want me for my

7   style as a DJ, my personality.  And that's why I think that

8   it's not right legally that you are asking for a 14-day

9   restraining order to not contact these clients because they're

10  not only Lou's clients; they're my clients too.

11         THE COURT:  Based upon the evidence, including the

12  declaration of Mr. Loiben and the evidence that I heard here

13  in open court under oath, I'm going to grant partial relief;

14  in essence, the part of the relief that's agreed to at this

15  point.  On the proposed order, I'm going to grant the first

16  three but not the fourth restriction or enjoinment.

17         He is going to be enjoined from infringing on

18  Personalities' copyrighted works.  That includes taking down

19  all of the photographs, copyrighted photographs.

20         He is enjoined from encouraging or facilitating

21  others regarding infringement of copyrighted works.

22         Also he is enjoined from making any representation or

23  implication of affiliation, connection, or association with or

24  sponsorship or approval by Personalities.  An example of that

25  is what we had talked about here, the hashtags or the use of

1   the term Personalities or Personalities, Inc. on his website

2   or social media accounts.

3           I will point out that initially, Mr. Khanani, in

4   terms of his representations, seemed to be saying that there

5   was no harm, in terms of the balancing that has to take place,

6   the balance of harms.  But implicit in what he was saying, and

7   he made it clear later, is the fact that that is not true.  He

8   obviously does have an interest in going forward with these

9   contacts, the contacts and possible contracts that the

10  plaintiff wants him to be barred from making.  So I think that

11  there is harm here and that balancing does come into play.  So

12  at this point, the order is going to be entered as to those

13  three issues but not as to soliciting or contracting with the

14  four individuals that were proposed; that being Zzazz

15  Productions, Z-z-a-z-z, i.e., that person is Tracy Tarrantino

16  who has been mentioned; Merchandise Mart Properties,

17  Incorporated.  That was the aforementioned Susan Glick and her

18  associates.  Also Harper College.  That's Mr. Thomas Tucker.

19  And Live Event Productions.  That's Ava Anthony.  So that part

20  of the motion is not going to be granted.

21          14 days from today, Ms. Fratto, is March --

22          THE CLERK:  March 6th.

23          THE COURT:  March 6th at 4:00 p.m.  The order shall

24  remain in full force and effect for 14 days until 4:00 p.m. on

25  March 6th unless modified or dissolved before that date.

1          I agree with the plaintiff that no bond is needed;

2   that that is waived.

3          MR. ROSENFELD:  Your Honor, if I might ask for a date

4   before that, before the expiration on March 6th, for a

5   preliminary injunction hearing?

6          THE COURT:  Ms. Fratto, if I'm going to transfer this

7   to the magistrate judge, do we set a date or let the

8   magistrate judge figure it out, he or she will prioritize the

9   case because of the nature of the claim?

10         THE CLERK:  Correct.  We won't set a date.

11         MR. KHANANI:  Your Honor, may -- I'm sorry to

12  interrupt.

13         I will take down any picture that they want.  But I

14  just don't want it to come to where they come and say, these

15  pictures are still up.  In the social media, people copy and

16  paste pictures and they could take an image that I put and put

17  it on another website.  So anything that they see that they

18  don't want up, if they can, like, somehow e-mail me and I will

19  take -- do my best to take everything that I have control over

20  down.  But I just don't want to come to court again and they

21  say, he didn't follow with this order because this stuff is on

22  some certain website.  They could be on fashion show websites.

23  I don't know.  That's just the way that social media is.  You

24  can never control what's out there.  But anything that I have

25  control over -- I've already taken down from Instagram and

1    from Facebook and there was -- there wasn't anything I saw on

2    my website; but anything that they've sent me is taken down,

3    but I can't control everything.

4         THE COURT:  Counsel, if you believe that there is

5    something he can control, he's inviting you to inform him of

6    that so that he can take care of it.

7         MR. ROSENFELD:  Sure.

8         THE COURT:  All right.  I'm going to transfer it to

9    the magistrate judge.  The assigned magistrate judge here

10   is --

11        MR. ROSENFELD:  I believe it's -- one moment, Your

12   Honor.

13        THE CLERK:  Judge Rowland.

14        THE COURT:  Judge Rowland.

15        MR. ROSENFELD:  Judge Rowland, right.

16        THE COURT:  And then Judge Rowland will reach out to

17   the parties.  And, Ms. Fratto, can we work off of their

18   proposed order and amend it?

19        THE CLERK:  Yes.

20        THE COURT:  And I will enter that order today.

21        And is Mr. Khanani served with that order?

22        MR. ROSENFELD:  He has a copy of it --

23        MR. KHANANI:  I have a copy.

24        MR. ROSENFELD:  -- Your Honor.

25        THE COURT:  Okay.

1         MR. ROSENFELD:  So, Your Honor, I should schedule the

2  preliminary injunction hearing with Magistrate Judge Rowland?

3         THE COURT:  Yes.

4         MR. ROSENFELD:  Okay.  Thank you, Your Honor.

5         THE COURT:  Thank you.

6         MS. EDWARDS:  Thank you, Your Honor.

7         MR. KHANANI:  So he's going to contact me for a court

8  date?  Somebody is?

9         THE CLERK:  Yes.  They'll let you know when it's

10  before the magistrate judge.

11         MR. KHANANI:  And then I have to show up for court

12  and -- to say that I didn't do anything or --

13         THE COURT:  He is going to make a motion for a

14  preliminary injunction.

15         MR. KHANANI:  Okay.  Thank you.

16              *    *    *    *    *

17

18  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

19

20

    */s/ Nancy C. LaBella*                *March 5, 2015*

21  Official Court Reporter

22

23

24

25